## STIRLING v. WAGNER.

BILL OF EXCEPTIONS—ALLOWANCE BY EX-JUDGE—ADJOURNMENT
OF DISTRICT COURT OVER INTERVENING TERM IN ANOTHER
COUNTY—FRAUDULENT SALES—INDICIA OF BAD FAITH—INAD-
EQUACY OF CONSIDERATION.

1. The statute in respect to the procedure relating to bills of
exceptions should be liberally construed.

2. The judge of a court before whom a case has been tried,
may, after the expiration of his term of office, allow and
sign a bill of exceptions.

3. Where a bill has been allowed and signed by an ex-judge
who tried the case, and thereafter is ordered to be made a
part of the record by the court which is presided over by
the successor of such ex-judge, all within the time origin-
ally fixed by the court for the presentation of the bill, the
statute has been substantially complied with.

4. In the absence of a statute fixing the date for closing
terms of the district court or regulating the duration there-
of, a term of court in one county may be lawfully adjourned
to a day succeeding an intervening term or session in an-
other county of the same district; and a judgment rendered
on such adjourned day is rendered by a competent court on
a judicial day of that court.

5. Upon the facts in the case at bar, a sale of a stock of
merchandise held void as to creditors on the ground of
grossly inadequate consideration.

6. In a contest between a sheriff holding a stock of mer-
chandise under attachment and a claimant in replevin, who
bases his right upon a recent purchase of the goods from
the debtor, the knowledge of the claimant that the debtor
had been buying large quantities of goods on credit, while
the claimant secretly held his demand notes for large
amounts, and that, at the time of the purchase, was being
annoyed by his creditors; and the testimony of the claim-
ant conflicting with a former affidavit made by him respect-
ing the consideration of a note which constituted the con-
sideration of the purchase attacked as fraudulent, and the
failure to produce the debtor as a witness, or explain his
absence, and a failure to produce the books of the concern
to show the values of the stock, etc., are facts which indi-
cate bad faith and tend to show fraud.

[Commenced in District Court, Dec. 31, 1888.    Decided Dec. 15,
        1892—Rehearing denied May 13, 1893.]

ERROR to the District Court of Sweetwater County, HON.
SAMUEL T. CORN, Judge.

Replevin for a stock of merchandise held by the sheriff
under several writs of attachment sued out by creditors of
E. J. Wagner.    The plaintiff, Charles Wagner, claimed owner-
ship of the goods under a bill of sale executed September 15,
1888, and possession taken thereunder, and alleged the value
of the goods to be $17,000.    The answer denied that the
goods were worth more than $9,000, alleged the insolvency
of E. J. Wagner at the time of the execution of the bill of
sale, that the transfer to plaintiff, his brother, was fraudulent
and made with intent to cheat and defraud the creditors of E.
J. from whom most of the stock was alleged to have
been purchased.    The issuance and levy of the writs of at-
tachments were also set forth in the answer.    It was further
pleaded by the defendant that E. J. Wagner had obtained
credit for the goods which he had added to the stock by
false and fraudulent representations respecting his financial
condition, and the circumstances of his original purchase of
the store located at Laramie in this state, which contained the
property in controversy, and of a mercantile business which
he also carried on at Ogden, Utah; that plaintiff had personal
knowledge of such fraudulent representations and of the in-
solvency of E. J. at the time of the transfer, and that plain-
tiff and E. J. Wagner were in collusion in the frauds alleged.
Plaintiff filed a reply denying all knowledge of any false
representations to creditors on the part of E. J., or that the
transfer under which he claimed was made with any fraudu-
lent design, or that he was in collusion with E. J. in any pur-
chase of goods, or that he knew the latter's insolvency.    The
plaintiff also alleged in his reply and claimed on the trial
that the transfer was made to him in good faith and for a
valuable consideration.    Charles and E. J. Wagner had been
in partnership conducting the Ogden and Laramie stores, and
in February, 1888, E. J. claimed to have bought his broth-

er's interest in the Laramie store. He also bought his co-partner's interest in the Ogden store, giving his notes on both purchases for about $35,000, each payable on demand. The other material facts are stated in the opinion.

The district court found and so adjudged that the plaintiff was the owner and entitled to the possession of the property at the commencement of the action, and that he had been damaged in the sum of $900 by reason of its detention by defendant for which amount together with costs judgment was rendered. Defendant prosecuted error.

*T. J. O'Donnell* and *W. S. Decker*, for plaintiff in error.

The undisputed facts and Charles Wagner's own story show that there never was a bona fide sale to Charles by E. J. Wagner. The story of their transactions as related by Charles is improbable as shown by the other evidence, and his failure to produce his books and the testimony of E. J. Wagner. He made no effort to obtain such testimony, or to get his brother's books, and his pretense that he did not know the whereabouts of either his brother or the books is apparently false and tricky. The absence of an inventory, bill of sale, and agreement to protect Charles against the debts of the co-partnership when he purchased the Ogden and Laramie stocks, the giving as the consideration for such purchases notes for large amounts payable on demand, all indicate a fraudulent intent. The note for $19,000, given for the interest of Charles in the Laramie store was for an amount largely in excess of the cost and actual value of the property purchased. The stock had been largely increased when it was turned back to Charles in September, 1888. Such facts are all badges of fraud. (Wait on Fraudulent Conv., Chap. 16, Sec. 224 et seq.)

The transfer including all the property of the debtor, was a general assignment, and as it undertook to prefer a particular creditor was fraudulent and void. (Rev. Stat., Sec. 96; White v. Cotzhausen, 129 U. S., 329.) There was no change of possession. Placing McCord, an employee of E. J. Wagner,

who was already in possession for him, in charge for Charles, did not constitute such a change of possession as is recognized by the law. (Twyne's case, 3 Coke, 80; 1 Smith's Leading cases, part 1, p. 1; Hamilton v. Russell, 1 Cranch, 309; Wilcox v. Jackson, 7 Colo., 521; Bassinger v. Spangler, 9 Colo., 175; Sweeney v. Coe, 2 Colo., 485; Clow v. Woods, 5 S. & R., 275; Wolf v. Kahn, 62 Miss., 814; Hull v. Sigsworth, 48 Conn., 254; Steelwagon v. Jeffries, 44 Pa. St., 407; Wright v. McCormick, 67 Mo., 428; Claflin v. Rosenberg, 42 Mo., 439; Bishop v. O'Donnell, 56 Mo., 158; Wait, Chap. XVII.)

The judgment should be set aside because it was rendered while the same court was in session in Carbon County. Regular terms of the district court were fixed for each county composing the district by Chap. 75, Laws 1890. It was not the intention of the legislature that more than one of these courts should be in session at the same time. (Freeman on Judgments, 3d Ed., Sec. 121.) Cooper et al. v. Am. Cent. Ins. Co., 3 Colo., 318; Filley v. Cody, 4 Colo., 109. The objection to such a judgment is jurisdictional. Jurisdiction cannot be conferred by consent. (Molandin v. Colo. Central R. R. Co., 3 Colo., 173; Bates v. Gage, 40 Cal., 183; Gregg v. Cooke, Peck (Tenn.), 82; Hermandez v. James, 23 La. Ann., 483.) If the court is held at a time unauthorized by law, all its judgments and proceedings are without warrant of law and void. (Galusha v. Butterfield, 2 Scam., 227; Dunn v. State, 2 Ark., 229; Brumley v. State, 20 Ark., 77; White v. Riggs, 27 Me., 114; Cullum v. Casey, 1 Ala., 351; Weightman v. Kaisuer, 20 Ala., 446; Garlick v. Dunn, 42 Ala., 404.) An order made by a judge residing out of his district at a time when the judge of the district is holding court therein is void. (Freeman, p. 121; People v. O'Neil, 47 Cal., 109.)

To show that a conveyance was made with intent to hinder, delay or defraud creditors, the declarations of the grantor made before and at the time of conveyance are admissible. (Knox v. McFarran, 4 Colo., 596.) Where one derives title from another, the declarations of the grantor in relation to his right, made while holding the title which he transferred, are admissible against the grantee. (Fellows v. Smith, 130 Mass.,

378; McCarless v. Reynolds, 67 N. C., 268; Compton v. Fleming, 8 Blackf. (Ind.), 153; Mueller v. Rebhan, 94 Ill., 142; McSweeney v. McMillan, 96 Ind., 298; McFadden v. Ellmaker, 52 Cal., 348; Walker v. Ellidge, 65 Ala., 51; Murrick v. Alvin, 15 Ill. App., 606; Rush v. French, 1 Ariz., 99.) It is necessary to show that E. J. Wagner was a fraudulent grantor; his conduct and intent respecting the estate conveyed, tending to prove a fraudulent intention, are proper evidence. (Bridge v. Eggleston, 14 Mass., 245; Wait, 277.) The rejection of such evidence was error.

*Brown & Arnold,* for defendant in error.

The bill of exceptions was not properly signed. A judge who tried the case cannot after the expiration of his term of office allow and sign a bill of exceptions. The act is a judicial one and the weight of authority is against the authority of an ex-judge to so allow and sign a bill. (Chap. 38, Laws 1890, Sec. 1; Scribner v. Gay, 5 Mich., 512; Van Valkenburg v. Rogers, 17 Mich., 322; Tefft v. Windsor, id., 425; Crittenden v. Schermerhorn, 35 Mich., 360; Smith v. Baugh, 32 Ind., 163; Ketchum v. Hill, 42 Ind., 64; Ry. Co. v. Rogers, 48 Ind., 427; McKeen v. Boord, 60 Ind., 280; Fellows v. Tait, 14 Wis., 156; Davis v. Menasha, 20 Wis., 205; Hale v. Haselton, 21 Wis., 325; Phelps v. Conant, 30 Vt., 277; Edwards v. Tracey, 2 Mont., 22; U. P. R. R. Co. v. Byrne, 2 Wyo., 111.) Rule 15 of the court with reference to filing briefs has not been complied with by plaintiff in error and for that reason the proceedings should be dismissed. See Rules 21 and 28. The summons in error was not made properly returnable. It was issued in term time and was not made returnable on a day thereof; and further ten copies of the record were not printed and filed as required by law at the time the petition in error was filed.

If the contention of plaintiff in error that the court was without jurisdiction to render judgment is correct, then motion to dismiss should prevail, as appeals or error proceedings can only be taken from valid final judgments. (Freeman on

Judg., Sec. 121; Wicks v. Sudwig, 9 Cal., 175.) In a motion for a new trial a statement of a ground therefor as follows, "For several errors of law occurring at the trial, and to the commission of each and every of which the defendant at the time excepted," is too general and presents no error for review. (Thompson on Trials, Sec. 2754; Hill v. Wersder, 49 Cal., 148; id., 340; Boburg v. Prahl, 3 Wyo., 325. The court was right in the rejection of evidence. 1 Bigelow on Frauds, p. 170; McElfabrick v. Hicks, 21 Pa. St., 402; Moses v. Dunham, 71 Ala., 173.) A ruling of court on objection to testimony is not an abuse of discretion preventing a fair trial. (Latimer v. Ryan, 20 Cal., 622; Arrington v. Tupper, 10 Cal., 464; McMin v. Wheelan, 27 Cal., 320.) Appellate court will not vacate a verdict or finding for excessive damages unless it is clear that the jury or court acted under influence of passion or prejudice. (Potter v. Seale, 5 Cal., 411; Taylor v. Ca. Stage Co., 6 Cal., 230; Kinsey v. Wallace, 36 Cal., 463; Myers v. San Francisco, 46 Cal., 215.) "Errors of law" is not included in the expression "contrary to law" or "against law" in the provision of the statute authorizing a new trial when verdict is contrary to law. (Rev. Stat. 1887, Sec. 2652; Martin v. Matfield, 49 Cal., 46; Amos v. Santa Clara, 40 Cal., 45.) Unless the jury or court has acted in total disregard of the evidence or the great weight of the evidence a verdict or finding will not be set aside on the ground of the insufficiency of the evidence. (Garbanati v. Hinton, 2 Wyo., 271; Granger v. Lewis, 2 Wyo., 231; Rice v. Cunningham, 12 Cal., 425; Crook v. Forsythe, 40 Cal., 622; Putnam v. Lamphier, 36 Cal., 472; Helman v. Howard, 44 Cal., 104; Lick v. Madden, 36 Cal., 213; Frost v. Harford, 40 Cal., 166; Griswold v. Benley, 1 Mont., 545; Fein v. Tonn, 2 Wyo., 117.) There was a change of possession; and if there is any evidence in support thereof the judgment cannot be disturbed. The same consideration applies to the question of the bona fides of the sale from E. J. to Charles Wagner. The court had jurisdiction to render the judgment. Courts held in each of the counties are separate and distinct courts. (Chap. 75, Sess. Laws 1890; U. S. Rev. Stat., Secs. 1907, 1909, 1910; Biery

v. U. S., 2 Colo., 186; U. S. Rev. Stat., Secs. 1865 and 1874.) The transfer to Charles Wagner was not of all the property owned by the vendor. The testimony shows the contrary. Under the evidence the authorities cited to show that the bill of sale was a general assignment are not applicable. If it did operate as such an assignment the preference only would be void. (Preston v. Spaulding, 120 Ill., 208.) At common law and under our statutes a failing debtor so long as he holds dominion over his property may convey it to a single creditor for a fair consideration. (Clark v. White, 12 Pet., 178; Thompkins v. Wheeler, 16 Pet., 106; Buffom v. Green, 5 N. H., 71; Stover v. Herrington, 7 Ala., 142; Fort v. Williams, 3 B. Mon., 550; Sibley v. Head, 3 Mo., 290; Johnson v. Whitwell, 7 Pick., 71 and 73; Nostrand v. Atwood, 19 Pick., 281, 284; Hullington v. Lund, 2 Mich., 309, 313; Hopkins v. Beach, 26 Pa. St., 85; Archer v. O'Brien, 7 Hun., 146; Burrell on Assgts., 3d. Ed., Secs. 160-167 and notes; Rev. Stat. Wyo., Sec. 94; Wearne v. France, 21 Pac., 703, 3 Wyo, 273.)

## ON RE-HEARING.

Where there is any evidence to sustain the finding the supreme court will not disturb the judgment. Same cases cited as above. The investment of Charles Wagner in the business furnished the consideration of the $19,000 note instead of the goods and accounts. The note was given in settlement, and not solely for the Laramie store at its then value, and it was supported by an adequate consideration.

GROESBECK, CHIEF JUSTICE.

Three questions arise in this case, the sufficiency of the authentication of the bill of exceptions, the validity of the adjourned term of the trial court, and the merits of the controversy. 1. The bill of exceptions is assailed on the ground that it was signed by Honorable Samuel T. Corn, the trial judge, after the expiration of his term of office. The cause was heard before him as presiding judge of the district court

for Sweetwater County at the April term thereof in the year 1890, and the trial of the cause, as to the introduction of the evidence and the argument of counsel, which was heard to the court sitting as a jury, was concluded on Friday, the ninth day of May, 1890. The court reserved its judgment, adjourning until the 19th day of May, 1890, when it reconvened and judgment was rendered and entered in favor of the defendant in error and against the plaintiff in error. During the ten days intervening between the adjournment and the meeting of the court pursuant thereto, a term or a portion of a term, the record does not disclose which, of the district court for Carbon County was held, as the statute then in force fixed the beginning of the term of the district court of that district for Carbon County therein, for the second Monday of May, which occurred in that year, 1890, on the twelfth day of that month. A motion for a new trial was immediately filed by the plaintiff in error, after the entry of the judgment, which was overruled by the court, and the plaintiff in error asked leave to prepare, present and file his bill of exceptions at any time before the first day of the next term of the court, or on or before September 22, 1890, the first day of the next term of that court, and permission to do so was granted by the court. On this first day of the term, September 22, 1890, plaintiff in error filed his bill of exceptions in open court, and on the following day applied for a rule on said Samuel T. Corn, ex-judge of said court, to show cause why he should not be directed to allow and sign said bill of exceptions. An affidavit was filed in support of this motion but it is not in the record. The rule was granted, but on the 10th of October following the application therefor was withdrawn and the following order was entered of record: "And it appearing to the court that said bill of exceptions was prepared and presented to the said Samuel T. Corn within the time allowed by law and the order of the court, to wit: on the 18th day of September, 1890, being within the time ordered by the court; and it further appearing to the court that the said bill of exceptions has been duly allowed, signed and sealed by the said Samuel T. Corn, who was judge of this

court during the trial of said cause, and the judge before whom the cause was tried, Now, on motion of J. H. Symons, attorney for the defendant, as aforesaid, it is ordered by the court that said bill of exceptions be filed with the pleadings in this cause and be made a part of the record therein." This order was signed by the presiding judge, who was the successor of Judge Corn, and is entered on the journal of the court. The following appears as the authentication to the bill of exceptions: "And now on this 18th day of September, 1890, being within the time allowed therefor by law and the order of the court, the defendant presents this his bill of exceptions to Samuel T. Corn, who was judge of said court during the trial of said cause, and the judge before whom the cause was tried, but who has since vacated the bench and been succeeded by Asbury B. Conaway, as judge of said court, and asks that he, the said Samuel T. Corn, allow, sign and seal the same, all of which is now done on the date last aforesaid. Samuel T. Corn. (Seal.)" From this allowance or authentication of the bill, if such it may be termed, it appears that Judge Corn had retired from the bench when the bill was presented to him, and that it was presented in vacation four days before the first day of the September term of the district court. Yet the attorneys for the plaintiff in error, the defendant below, asked for a rule upon ex-Judge Corn to show cause why he should not allow and sign the bill, when it appears that it was allowed and signed by him four days before. As this application was withdrawn and the affidavit in support of it, is not incorporated in the record, it is impossible to ascertain the grounds of the application.

1.  The statute relating to bill of exception, then and now in force, is as follows: "When the decision is not entered on the record, or the grounds of objection do not sufficiently appear in the entry, or the exception is to the opinion of the court on a motion to direct a non-suit, to arrest the testimony from the jury, or for a new trial for misdirection by the court to the jury, or because the verdict, or if a jury was waived, the finding of the court, is against the law or the

evidence, the party excepting must reduce his exception to writing and present it to the court, or to the judge thereof in vacation, within the time given for allowance. If true, it shall be the duty of the court, if presented in open court, or the judge before whom the cause was tried, if presented in vacation, to allow and sign it, whereupon it shall be filed with the pleadings as a part of the record, but not spread at large upon the journal. If the writing is not true the court or the judge in vacation shall correct it, or suggest the correction to be made, and it shall then be signed as aforesaid." R. S. Wyo., Sec. 2649, as amended by Sec. 1, Chap. 38, Sess. Laws of 1890. The bill purports to give the evidence in the cause, and the various exceptions taken by counsel for plaintiff in error to the admission or rejection of evidence, or the rulings of the court upon other matters during the progress of the trial. One ground of error relied upon is that the judgment and findings are not supported by sufficient evidence and are contrary to law. It is only necessary, in my judgment, to pass upon the sufficiency of the evidence, and to ascertain if all of the evidence in the cause is preserved according to law and is properly before this court.

Under the statute prior to the amendment it was held by the supreme court of the territory (McBride v. U. P. Ry. Co., 18 Pacific, 635) that a judge in vacation might allow and sign a bill of exceptions, presented to him in apt time, although the power of a judge in vacation to perform that function was less explicit than in the present law, and notwithstanding there were at that time at least two decisions of the territorial supreme court to the contrary, grounded on a statute identically the same as to the powers of the district court or a judge thereof in vacation to allow and sign the bill. Jubb v. Thorp, 2 Wyoming, 406; Woods v. Hilliard Flume & Lumber Co., Id., 457. Since that time the terms of the statute have been enlarged in such a manner as clearly to confer the power of allowing and signing a bill of exceptions upon the judge in vacation as well as upon the court. He must be, however, the judge before whom the cause was tried, and no other

judge possesses this power. The question before us, is whether or not a judge who has left the bench has such power, when the bill is presented to him, he being the judge who tried the cause. The statute (Sec. 2646, Rev. Stat.) provides that "time may be given to reduce the exception to writing but not beyond the first day of the next succeeding term." It may then be presented to the court on that day, the first day of the next term, to be allowed and signed by the court. Sec. 2649, quoted supra, provides that the court, if presented in open court, as well as the judge in vacation, if the judge before whom the cause was tried, if it or he finds the bill to be true, to allow and sign it, and "if the writing is not true, the court or the judge in vacation (meaning the trial judge) shall correct it, or suggest the correction to be made, and it shall then be signed as aforesaid." This evidently conveys the idea that the judge in vacation or the court to whom the bill is presented, has some positive knowledge of the facts in the bill set forth, as the bill must be corrected, if not true, or the suggestion made to have it corrected, and this duty is imposed upon the court as well as the judge in vacation before whom the cause was tried. How could Judge Conaway have known that the bill was correct? How could he have known whether or not to "suggest" any correction to be made? During vacation, after the retirement of Judge Corn, his predecessor, he could not have allowed or signed the bill, because he was not the trial judge, and that judge alone must sign and allow the bill if presented in vacation. Did Judge Conaway possess greater power as a court than he had as judge in vacation? The only way that he could have arrived at the correctness of the bill was to take testimony in open court as to the truth of the facts therein recited, and that the bill presented contained all of the evidence and all of the exceptions and a complete history of the facts not of record occurring during the trial. The statute provides no such method of ascertaining the truth of the bill, and if such power exists in a court presided over by a judge other than the one who tried the cause, it must be an implied power, as it certainly is not expressed. The rule in Indiana always has been that the suc-

cessor to the trial judge in such cases is the proper one to certify and authenticate the bill of exceptions, but Judge Elliott in his work on Appellate Procedure, Sec. 799, doubts the doctrine of these cases. He says: "Where the judge who tried the cause is still the incumbent of the office there can be no doubt upon the question as to who shall sign the bill, for the authorities are well agreed that it must be signed by the judge who tried the case. This rule applies to a special judge, for he has authority to sign a bill of exceptions tendered within the time granted by him. Our decisions (Indiana) declare that where a judge dies, or goes out of office by resignation, or because of the expiration of his term, he can not sign the bill of exceptions but that it must be signed by his successor. It seems difficult to sustain the doctrine of our cases, for it is not easy to conceive how an instrument importing absolute verity can be executed by one who has no knowledge whatever of the matters it assumes to state. Nor is it easy to conceive how such a doctrine can be harmonized with the fundamental principle that the statements of the judge upon disputed questions of fact concerning matters occurring in court are conclusive. It is difficult for us to escape the conclusion that the courts are right which hold that the successor of the judge who tried the case can not sign a bill of exceptions where there is a disputed question of fact, that is, a dispute as to what the bill should contain, and that the proper course where there is no judge who can sign is to award a new trial." (See Wright v. Judge of Superior Court, 41 Mich., 726; Scribner v. Gay, 5 Mich., (511); Tefft v. Windsor, 17 Mich., 425; Crittenden v. Schermerhorn, 35 Id., 370.) Our statute infers that the judge, whether in court or in vacation, must have the knowledge whether or not the bill is true, as if not true, the court or judge in vacation must correct it or suggest the correction to be made. It makes no difference whether or not the bill is disputed. There is no provision of our statute providing for the submission of the bill to the party adverse to the one seeking it. It may be prepared wholly without notice to the adverse party and submitted ex parte, and the duty of determining its correctness is lodged with the

trial judge or the court. Our code contains the usual code provision that its provisions "and all proceedings under it shall be liberally construed, in order to promote its object, and assist the parties in obtaining justice." Such would be the rule of construction of a remedial statute. Under the code, the construction must be liberal as to every part of it, applying to the preparation and signing of a bill of exceptions, and the court should save the rights of the parties by saving the bill if possible. Edwards v. Kearney, 13 Neb., 502; Morehead v. Adams, 18 Id., 569; Richards v. State, 22 Id., 145; Seward v. Klenck, 30 Id., 775; Greenwood v. Cobbey, 24 Id., 648. So it has been held as to the statute of Westminster 2d, the parent of all such statutes. Says Tarbell J. in his concurring opinion in the case of V. & M. R. R. Co. v. Ragsdale, 51 Miss., 458: "If ever there was a remedial statute whose provisions are to be liberally construed the statute of Westminster 2d is one, and the rules of practice regulating bills of exception should be enforced so as best to meet the ends of justice. With reference to the adjudications upon this practice, Powell on Appellate Proceedings, p. 254, Sec. 58, makes this very just criticism: 'It seems as though some courts were disposed to sustain any plausible objection to the bills of exceptions as an easy mode of disposing of the case; while others, in the spirit in which bills of exception were introduced into the practice, labor to make them available even against adverse circumstances which seem to thwart them.'" If we construe our statute liberally, there does not seem to me to be much doubt but that an ex-judge, who tried the case, may allow and sign the bill, if presented in the time fixed and limited by the order of the court. The statute requires the bill to be presented to the court or the judge thereof for allowance. These words standing alone might exclude an ex-judge, but this provision is modified by the following statement that, if true, it shall be the duty of the judge before whom the cause was tried if presented in vacation to allow and sign the bill. It may be said that an ex-judge cannot perform this duty as it is a judicial function. The text writers assume that the settling or allowance of the bill is a judicial

act while the signing of it is a mere ministerial duty. But this rule is an unsafe one, and there are decisions to the contrary with the best of reasoning. The bill merely recites what occurred at the trial, which is not of record, and is a mere narrative or historical account of those events. In some States by consent of the parties, the clerk of the court may sign the bill, in others where the judge is dead or disabled, two attorneys may allow and sign, while in others, in case of grave disputes, the bill may be settled by the testimony of bystanders or members of the bar. Certainly these provisions would be of doubtful constitutionality, and of as doubtful expediency, if the act of settling or allowing the bill were judicial. When allowing the bill, the court does not pronounce a judgment; it merely states that the exceptions taken in the bill actually occurred during the progress of the trial. By legislation, the act is a ministerial one, which by legislation could be committed to the clerk, or other fit person. V. M. R. R. Co. v. Ragsdale, 51 Mississippi, 447 (451). But as I have before stated, the exceptions need not be considered save the one only on the record to the ruling of the court below denying a motion for a new trial, on the ground that the findings or judgment are not sustained by the evidence. The evidence was taken down by a stenographer, who was a sworn territorial officer, and an officer of the courts under their direction. The statute in force at the time of the trial, signing the bill and when it was made a part of the record provided that any transcription made by the territorial stenographer should, when certified by him as correct, be filed among the papers in the case, action or matter in the court in which the same was tried or investigated, and when so filed, such transcript should "prima facie, be deemed to be and taken as a correct statement of such testimony, proceedings or investigation and the record thereof." Rev. Stat. Wyo., Sec. 1765.

In the course of the opinion in the case of People v. Williams, 91 Ill., 91, it is said: "It is, however, contended, that so long a time has elapsed since the trial of the cause that it is impossible for the judge to determine what the evidence was

on the trial. We do not apprehend there can be much trouble on this score. It is set up in the petition, and not denied in the answer, that a full phonographic report of all the evidence offered on the trial was made at the time by skilled reporters. If this be true, we cannot see how there can be much room for controversy in regard to the evidence." In Chase v. Vandegrift, 88 Pa. St., 217, it was decided that where a stenographer was appointed under the provisions of a statute of Pennsylvania, and performed his duty after qualifying under oath, that the statute providing that his notes should be official and the best authority in any matter in dispute, was intended to preserve and reproduce the evidence in its most accurate form by a sworn officer, and that an exception was not valueless so preserved because not sealed by the judge. It is remarked in the opinion: "One of the purposes of the appointment of the stenographer is to secure rapid and unabating progress in the trial relieving court and counsel from taking full notes. If a judge forgets an exception taken, is his want of recollection to deprive a party of this benefit of the notes of a stenographer because the judge declines to seal the bill? Clearly the act intended that the officer should perform a duty which would supersede the necessity of personal attention to these details by the court. It seems to us the act must receive this construction from its very terms as well as its intent and purpose."

The bill of exceptions as to what occurred on the trial are made up of the stenographer's notes reduced to long hand and certified to him, and this under the law became prima facie correct, when filed among the papers. This would seem to preserve the evidence, at least, in the best possible method. But I am not willing to rest the case on this ground. Although the cases are in hopeless conflict, the weight of reasoning is with those that hold that where a judge leaves the bench, he alone has the right to allow and sign the bill in a case tried before him. Some courts hold that in such a case a new trial should go as of course. In State v. Weiskittle, 61 Maryland, 48, the bill had been signed by an ex-judge by agreement of counsel. It was held that under the British statute (13 Ed-

ward I, the statute of Westminster) in force in that State, the bill could not be considered, as the ex-judge could not perform a valid judicial act after he ceased to be judge, and that no agreement of counsel permitting him to sign the bill could vitalize his void act. The appellant was permitted on renewal of his motion for a new trial in the court below to have a new trial. In this connection, the opinion reads: "In this State, it is not admissible for another judge to pass upon the correctness of his predecessor's ruling in such a case. The new trial will go as a matter of course, where the exceptions were not signed and sealed and cannot be, without any default of the exceptant." In New Mexico a bill of exceptions was signed by Judge Long, who succeeded Judge Vincent, in a case tried by the latter. The rule of the supreme court of that territory seems to have been the only procedure regulating the matter, and it provided that the bill should be submitted to the district judge before whom the judgment was obtained for settlement, and that he should thereupon correct and settle the proposed exceptions. It was said in the opinion that this rule of court was founded upon the practice in New York, and was in harmony with the decisions of the courts of that State, and its requirement that the bill should be settled and signed by the trial judge was consonant with reason and in line with the statute (31 Westminster, 2) to which such bills owe their origin. A number of authorities are cited in the opinion in support of this view, and the court proceeds: "From these authorities, which announce no more than the familiar rule observed by the great majority of trial courts in this country, as well as in England, it is very clear that the judge, before he can sign and seal a bill of exceptions, must know it to be true, and certify by the act of signing and sealing to its truth. Now can he conscientiously do this unless the proceedings set forth in it took place in his presence, as judge of the court, when they occurred? From these considerations we cannot escape the conviction that Judge Long could not legally know whether the proposed record and bill of exceptions were true or not, and that, therefore, he was not authorized to settle and sign the same." Wheeler v. Fick,

4 New Mexico, 36, 12 Pacific, 625. Judge Long, who signed the bill, was a member of this court and concurred in the opinion "upon careful examination." In the case last cited it is not directly held that the trial judge, after his retirement from office, could have signed the bill, but such would naturally be inferred from the opinion.

In Wisconsin the supreme court would not change the practice which had prevailed in that State admitting as valid a bill of exceptions signed by an ex-judge who had tried the case. Says that court: "It was objected on argument that there was no proper bill of exceptions in this case. It seems that the bill of exceptions was settled and signed by Judge Noggle after his term of office had expired. And it is said that a circuit judge, after his term of office expires, has no right or authority to settle a bill of exceptions in a case tried before him. In Fellows v. Tait, 14 Wis., 156, it was stated that the practice in this State has been for the person before whom a cause was tried to settle the bill of exceptions, although·he was no longer judge. We cannot perceive any valid objections to this practice, and indeed, unless the judge who tried the cause is sometimes permitted to settle a bill of exceptions after his term of office expires, it would deprive a party of the benefit of an appeal to this court. We were referred to the case of Phelps v. Conant, 30 Vt., 277, where the court holds that a judge, after his term of office expires, possesses no authority to amend a bill of exceptions. But our practice has been otherwise, and we are not disposed to change it." Hale v. Hazelton, 21 Wis., 325. See Davis v. Menasha, 20 Wis., 205. This ruling was not based on statute, but upon a practice prevailing in the State, and the court held that there could be no valid objection to that practice. There has been since enacted in Wisconsin a law regulating the matter, permitting the judge who tried the cause, although out of office, to sign the bill and providing mandamus to reach him, if he refuses to do so. In Fellows v. Tait, it was remarked: "And it seems to us that he (the trial judge) is the only person who can settle the bill of exceptions, for the plain reason that he alone knows what took place on the trial. How can the

present judge settle a bill of exceptions? He knows nothing about what testimony was given on the trial, or what exceptions were taken to the admission or exclusion of evidence, or what instructions were given to the jury upon which question of law arise. He must necessarily be ignorant of all these matters; and yet we are asked for an order directing him to give a true history of them, and settle a bill of exceptions which shall become a part of the record in the cause. This order we cannot grant." It was held in Galbraith v. Green, 13 S. & R., 85 (Penn.), that the regular mode of procuring a return of bills of exception by a judge whose office has expired is by certiorari directed to him. In Missouri the ruling is that the bill could only be signed by the judge who tried the case, and that the statute of that State contemplates that the matter of exception comes under the personal observation of the trial judge, and that error is called to his attention at the time, and the exception then and there taken. Cranor v. School District, 18 Mo. App., 397, citing with approval Consual v. Liddell, 7 Mo., 250. This case was followed by Connelley v. Leslie, 28 Mo. App., 551, wherein the court re-marks: "There is no bill of exceptions in this record which the court can consider. It appears from the record that the cause was tried before Hon. James B. Gantt, judge of that circuit, who went out of office before the bill of exceptions was signed. The bill of exceptions was afterwards presented to his successor, Hon. D. A. De Armond and signed by him. Judge De Armond had no authority to sign such bill of exceptions with or without consent of the parties." In Nebraska under a statute which provides, inter alia, that the party seeking the settlement of the bill must present it to the judge who tried or heard the case, for settlement and allowance, it was held that the trial judge alone had the statutory power to settle such bills, except the clerk of the court, where probably the bill was not contested or it was signed by that official by consent. The court cites the Wisconsin cases, supra, and says in conclusion: "Counsel for respondent has referred to a number of decisions from which it is claimed a different conclusion should be drawn, but in our view of the statute

we can adopt no other conclusion than that it is the duty of the 'judge who tried or heard the case' to settle and allow the bill, if presented within the time prescribed by law, without reference to whether his term of office has expired or not, and that a bill settled by him after the expiration of his term of office is legally settled." State v. Barnes, 16 Neb., 37. A peremptory writ of mandamus was granted requiring ex-Judge Barnes to settle and allow the bill. This case is fortified by another and more recent decision of the same court, wherein it is said: "A motion is now made to strike the bill of exceptions from the files, because not certified by the judge before whom the cause was tried, nor by the clerk of the district court, who, where the bill is assented to as being correct, may certify the same. The excuse is that Judge Groff before whom the case was tried, resigned the office of judge, and was appointed to an important position in Washington. This, however, was not a sufficient excuse to justify the failure to present the bill either to him or to the clerk for certification. In State v. Barnes, 16 Neb., 37, it was held that the judge who heard and tried the cause in the district court had authority to settle and allow a bill of exceptions in a case tried before him after the expiration of his term of office, and this, we have no doubt, is a correct statement of the law." Quick v. Schasse, 47 N. W., 935. The motion to strike the bill from the files was granted. Where the statute requires that a bill shall be settled or allowed and signed by the trial judge, there does not seem to be much difference of opinion among the courts. Another judge who may preside afterward in the same court has no such power. Sahlein v. Gumm, 43 Mo. App., 315; Chicago, B. & Q. R. R. Co. v. Johnson, 34 Ill. App., 351; Empire Land & C. Co. v. Engley, 14 Colo., 289, 23 Pac., 452; Fechmeimer v. Trounsteine, 12 Colo., 282, 20 Pac., 704; Thompson v. Duff, 17 Ill. App., 304; Davis v. Bradley, 79 Ill., 316; Brown v. Happ, 39 Georgia, 61; Jones v. Sprague, 2 Scam., 55. Ex parte Nelson & Kelly, 62 Ala., 376. These decisions are grounded upon the lack of knowledge of a judge other than the trial judge to authenticate the bill as true and to vouch for the .cor-

rectness of the narrative of the proceedings before another tribunal. Where a special judge is provided for, either by appointment of the regular judge or by election of the attorneys or otherwise, he alone must sign the bill even where he has left the bench. Shugart v. Mills, 125 Ind., 445, 25 N. E., 551; Bullock v. Neal, 42 Ark., 278; Cowall v. Altchul, 40 Id., 172; Watkins v. State, 37 Ark., 370. It may be said that as time may be allowed to the second day of the succeeding term to prepare and present the bill of exceptions, under our statute, that the court at this succeeding term, although presided over by a new judge, might satisfy himself by summoning witnesses to establish the truth of the bill and the historical matters therein narrated. In Illinois it was held that a trial judge who claimed that he had forgotten the evidence submitted to him without being taken down by a stenographer, and where only one party appeared, and there-fore would not sign the bill, should have examined witnesses at the trial to ascertain what they testified to. People v. Gary, 105 Ill., 264. But this was because a party should not be denied the right of appeal or writ of error which might be the result if a bill of exceptions could not be obtained. In the case at bar the bill was presented and filed in open court at the term following the trial and within the time allowed by law and the order of the trial court. If the presiding judge of the court in which the bill was presented could have allowed and signed the bill he would have been compelled to resort to the testimony of witnesses adduced at the trial to ascertain what they testified to, which would have been a tedious and questionable method of ascertaining the truth narrated in the presented bill, or by bringing the trial judge or the stenographer who took notes in full of the evidence and exceptions during the trial, before him to establish under oath what they have already certified to. Although it does not appear from the record that the party seeking the bill asked the court to allow and sign the bill, it was presented in due time and was made a part of the record by an order signed by the judge of that court. This is in effect an allow-ance of the bill. It had been signed before, and although the

allowance of the bill, technically and regularly, should precede the signing of it, yet the strict requirements of the courts holding that signing is a ministerial and allowance of the bill judicial have been complied with. There has been a substantial compliance with the statute, if construed strictly. If it was the "duty" of the court to allow and sign the bill I do not think that its failure to perform that duty is waived by the neglect of the party presenting the bill to explicitly ask its allowance. The duty is imposed by the statute, if imposed at all, upon the court which may be presided over by a different judge than the one who acted as the trial court, and the court should have performed this "duty" whether asked to do it or not. Actus curiae neminem gravabit. If the court at the term when the bill was presented and filed alone could have allowed and signed the bill, and it failed to do so, this would be ground for a new trial, in order to prevent a failure of justice and in order to secure to a diligent party the sacred right of appeal. The language of the statute to my mind conveys the idea that the court allowing the bill must have some knowledge of the matters detailed in it, otherwise it could not "suggest the correction to be made," as these indicate an accurate knowledge of the occurrences of the trial. A liberal construction of the law governing the procedure relating to bills of exceptions permits the trial judge who has gone out of office to allow and sign the bill. A strict construction of it, to my mind would only permit the judge who tried the cause, while he was judge to allow and sign it, and in that case a new trial should be granted under the authorities cited. I am inclined to think that the statute has been substantially complied with and that the bill is sufficiently authenticated. The motion to strike the bill from the files must be overruled and the bill must be taken as a true recital of the matters happening at the trial, and a true account of all the evidence before the trial court.

2. I think the adjournment of the district court of Sweetwater over the term or a portion of the term of the Carbon County district court, was valid. The record does not disclose whether or not the business of the Carbon court was

finished between the 12th of May and before the 19th of that month when the court reassembled pursuant to its adjournment in Sweetwater County and gave judgment in the case. There is nothing in the statute in force at that time or at the present time, fixing the time to be consumed in the sessions of any district court, or the date of its adjournment. It is contended that the term of court in Sweetwater County expired by operation of law before the time fixed by law for the beginning of the Carbon term, and when the term began in the latter county, it was an adjournment by operation of law of the term of court in Sweetwater County, and therefore all the proceedings in Sweetwater County at such adjourned term were coram non judice and void. The California cases cited are not in point. In that State, the statute fixed the time for the closing of the term. The statute provided that the several district courts should commence on specified days and that they "may continue until the date affixed for the commencement of some other term in the district." Smith v. Chichester, 1 Cal., 409. The cases were examined and commented upon by the supreme court of Montana in the case of Carland v. Commissioners, 5 Montana, 599, in the following language: "It is claimed that the order of the court confirming the action of the board was illegal, because on the 18th of April, when this order was made in the district court of Custer County, a term of the district court was being held in Choteau County of the same judicial district. The cases cited, so far as we have examined them, do not sustain this position when applied to the courts of this territory. They apply to cases such as where there was a statute fixing the time when a court should end, and the cause was tried after that time had expired; and when a term of court was fixed to be held in another county. Bates v. Gage, 40 Cal., 183; Gregg v. Cooke, 7 (Peck) Tenn., 82. Or to a case where a judge of one district, when in another district, composed of but one county, where the judge of the latter district is presiding over and holding his own court, makes an order relating to a matter pending in his own court. People v. O'Neill, 47 Cal., 109." It will clearly be seen that these cases do not apply

in Wyoming as they did not in Montana. The case of Gregg v. Cooke, 1 Peck (Tenn.), 82, has been much cited. In the Tennessee reports it is noted in the decision that it is overruled in Venable v. Curd, 2 Mead, 583, and the ruling in this latter case was finally adopted as the settled law of Tennessee. (Henske v. State, 3 Heiskell, 202.) I do not like the reasoning in the case of Venable v. Curd, but it has been favorably commented upon. The case was overruled upon a different point than the one considered, but even on this point, that the court was adjourned by operation of law before the commencement of another term in the same circuit and could not be prolonged into that term, it was thus criticized by the supreme court of Missouri, eight years after it was rendered and twenty-eight years before it was overruled in Tennessee: "The counsel have cited a case from Peak's (Peck's) Reports as being in point. We consider that case unlike the present case, in this, that the act of the legislature of Tennessee contains no provision for holding special adjourned terms of court. The Tennessee act says the court shall continue in session till all the business is done, or until it shall be necessary to adjourn to go to some other court. Nothing of the kind is found in our act. The substance of the case is, that the circuit court of Tennessee began a court in one county and held court that week, and on Monday of next week, which Monday was a day appointed to hold court in another county. The judicial acts done by the judge on Monday were holden by the supreme court of Tennessee to be void. We do not like that decision, and if our statute were exactly like that of Tennessee, we believe we would object to the reasons and grounds on which the case is made to rest." Samuels v. State, 3 Missouri (Houck), 78; Lewin v. Dille, 17 Mo., 69. The case of Carland v. Commissioners, supra, also discusses this point, for it is remarked in the opinion on this point: "Gregg v. Cooke, supra, was overruled by Venable v. Curd, 2 Head (Tenn.), 583, where it was held that the judgments and decrees of a judge regularly in office are valid when he held his court under color of a law that turned out to be repealed or invalid. * * * We know of no law and there

is no order of the supreme court of this territory fixing the time when a term of court shall terminate." See McAfee v. State, 31 Georgia, 418. In Illinois, the case of Archer v. Ross, 2 Scammon, 303, has been a stumbling block to many courts. It was there held that a judge of a circuit court had no authority to appoint a special term of court under the statute, without reasonable notice and to commence at a time when he was required by statute to hold court in another county. In State v. Leahy, 1 Wisconsin, 225, it was said, referring to this case of Archer v. Ross: "The reasoning of the court does not seem very clear." It seems also from reading the opinion that the time for holding the term was regulated by law. It was noticed in Smurr v. State, 105 Indiana, 125, where the decision in State v. Leahy seems to be approved. In Ex parte Lilley, 7 Richardson (S. C.), 374, the judge attempted to hold court open by directing the clerk daily to enter an order of adjournment until the next day, and in the meantime the judge was holding court elsewhere. He afterwards returned and tried a criminal case. It was held that this could not be done, and the term in the one county was adjourned by operation of law when the term in another county began. The Iowa cases have been cited. In Davis v. Fish, 1 G. Greene, 412, it was held that all acts performed after the legal limitation of the term were void. But there it appears that the term of court was limited to one week, commencing on Monday and ending on midnight of the following Saturday, the last day of the term "fixed by statute." The Iowa statute is not accessible, but the language implies that the duration of the court was limited to one week. The case of Grable v. State is much stronger. There the term in Clinton County ended on Wednesday evening preceding the day fixed by statute for the beginning of the term in Scott County, the trial was continued and finished in Clinton County on the first day of the Scott County term in the same district, and the adjournment was entered the following Friday, as of the day previous, in order to show the close of the Clinton term before the beginning of the Scott term; and it was held that this was irregular and void. This case though

much cited elsewhere does not seem to have received much
favorable notice in Iowa.   It was thus referred to in the
case of State v. Knight, 19 Iowa, 99:   "The cases of Davis v.
Fish (1 G. Greene, 406) and Grable v. State (2 Id., 559) are
cited and relied on by the defendant.   Whether those two
cases, under the statutes then in force, were decided correctly
may admit of great doubt.   These cases go upon the ground
that two terms of court cannot be held in two different coun-
ties by the same judge concurrently; that the term of court
necessarily expires at twelve o'clock at night of the secular
day next preceding the first day fixed for court in another
county whether that court is actually opened or not, and this
as respects causes on trial and not finished.   This seems to
be rather a rigid and technical construction; and it is one
which we hold has no application under our statutes as they
now stand."   They received unfriendly mention in the case
of State v. Clark, 30 Iowa, 168:- "In Davis v. Fish it was held
illegal to receive a verdict and render judgment thereon on
Sunday, and it is also there said that all acts performed after
the legal limitation of the time (twelve o'clock Saturday
night) were coram non judice and void.   The precise point
ruled in Grable v. State, 2 G. Greene, 559, was that a special
term could not be ordered without the previous notice re-
quired by statute, at the close of the regular term, so as to con-
tinue its session into the time fixed for a regular term in an-
other county.   The statute then in force authorized the
judge to adjourn the regular terms and hold special terms in
lieu thereof; so that the objection must have been alone to
the time and manner of doing it, and not the power to do it."
There is no such limitation. in the Wyoming statute.   In
Cook v. State, 54 Iowa, 640, it was held legal for a judge to
extend a term of court in his county beyond the time fixed
for the commencement of the term in another county, for at
least three days, if the public business required it, during
which time the clerk in the latter county could adjourn the
court from day to day.   It was said:   "No statute is violated
in their (the judges) so doing.   Davis v. Fish and Grable v.
State were decided in 1848 and 1850.   At that time the

statutory provisions were materially different from what they are now." See Weaver v. Cooledge, 15 Iowa, 244; State v. Clarke, 30 Id., 168. But there is a case directly in point, decided January 29, 1892, In re Hunter's Estate (Iowa), 51 N. W., 20. It is "the end of all controversy" in this summary review of the Iowa cases and effectually disposes of the "leading" cases referred to in so many decisions, those of Davis v. Fish and Grable v. State. The court adjourned some sixteen days and reassembled. In the interval, a regular term was held in another county in the same district. The opinion says: "Appellee moves to dismiss the appeal on the ground that the order permitting the appeal was made after the January term of the district court in and for Johnson County had expired by operation of law, and no time was granted during the term for settling the bill of exceptions. We are not favored with an argument by appellees in support of the motion, but understand it to rest on the fact that because on February 1st the court adjourned 'the January term in said county to the time subsequent to the holding of the February term in Iowa county' the act was illegal, and the January term expired by operation of law. Adjournments of the business of a term of court from day to day and from time to time, as the necessities of the situation seem to demand, is essential to the conduct of the business and has the sanction of universal usage. Such a right is not questioned. Without the intervening term in Iowa County the validity of the adjournment to February 17th would not, we suppose, be questioned. How does that fact affect the situation, or why should it render the judgment or order void? It is certainly without effect on the Johnson County term. Barring the fact that the same judge held the two terms, they are as entirely distinct and independent as are terms held in different districts.

The fact that the same judge holds the two terms is not of importance. It is the holding of distinct and separate terms, each unaffected by the other. There is nothing in public policy or private interests that demands a rule that such adjournment is void. In Davis v. Fish, 1 G. Greene, 406, the ruling is

placed on the ground that the law limited the term to one week, beyond which the court could not extend it. The holding in Davis v. Fish is in State v. Knight, 19 Iowa, 94, 'doubted;' and a more liberal rule is stated upon facts more favorable to the rule contended for by appellant than are those of this case. We hold that the adjournment was valid, and the proceedings unaffected by the adjournment." In the case of Cooper v. American Ins. Co., 3 Colorado, 318, the court held to the contrary citing but the two cases of Grable v. The State and Archer v. Ross. The judgment in the case, however, seems to have been entered while the judge was holding court elsewhere, or had adjourned for the term before the judgment was rendered as the judge directed it to be filed by the clerk in vacation. There is no pretense that the judgment was rendered at an adjourned term of court held after the term or portion of a term of the court in any county of the district had been held. It is stated in the opinion of the court: "By fixing the time for the commencement of the term of court in one county, the law, by necessary implication, limits the duration of the term immediately preceding in another county of the district, and unless sooner terminated by adjournment, the term will expire by limitation of law, at the time fixed for the succeeding term." In the absence of a statute so expressly providing, this is not the law. It is not in harmony with the recognized inherent power of a court of general and superior jurisdiction to adjourn to a distant day, even over an intervening term of court, unless this power is restricted by statute. Mr. Chief Justice John Marshall, in the case of Mechanics' Bank of Alexandria v. Withers, 6 Wheaton, 106, announced this general principle, that the power to adjourn the circuit court of the District of Columbia to a distant day was "a power common to all courts," and that the special act of Congress enabling these courts of that district to hold adjourned sessions did not vary the law of the case. Speaking of the act of Congress, the court says: "These words do not, in themselves, purport to vary the character of the session. * * * They were probably inserted from abundant caution, and are to be ascribed to an apprehension that

courts did not possess the power to adjourn to a distant day until they should be enabled to do so by a legislative act. But this act, affirming a pre-existing power, ought not to be construed to vary the nature of that power, unless words are employed which manifest such intention." This case has been followed by other courts. Thurman, J., says in Harris v. Gest, 4 Ohio St., 470: "There is nothing in the constitution that forbids the holding of common pleas courts in different counties of a subdivision at the same time. Courts are not limited in their power of adjournment to an adjournment from one day to a succeeding day. They have an inherent power to adjourn to a more distant day, when not restrained by the constitution or statute law; and there is no such restraint upon the common pleas courts in Ohio. 6 Wheat., 106. When this power is exercised, the sitting after the adjournment is a prolongation of the regular term and in contemplation of law, there is but one term, 6 Wheaton, supra. But the 'additional term' provided for by section 5 of the act of January 31, 1854 (52 Ohio L., 10) is a distinct term and not a prolongation of the regular term." In this case during the adjournment of the court of common pleas for Franklin County that court was held by the same judge in Madison County in the same subdivision. The same principle was announced on review of the cases in Smurr v. State, supra. This being established by the most respectable authority, the opinion of the Kansas supreme court in State v. Montgomery, 8 Kansas, 358, is in point: "The legislature have named the day for the opening of the term of court but not for the closing. That is confided to the discretion of the judge, and is determined by the amount of business and the necessity of suitors." Adjourned terms, as well as special terms, were allowed by the Kansas statute, but the Kansas act may well be said to be a declaratory statute, enacted, not as a new provision of law, to cure the defects of some existing rule, practice or affect of the common law, but so far as its provisions for adjourned terms are concerned, enacted "from abundant caution," as was the act of Congress referred to in Mechanics' Bank v. Withers, 6 Wheaton, 106, supra.

The case of In re Millington, 24 Kansas, 214, is different, as the proceeding set aside was begun on a day fixed for the beginning of a new term of the district court of another county of the district to be held by the same judge. In this other county, a judge pro tempore was elected in lieu of the regular judge to conduct the business of the court, and the Supreme Court held that this was not permissible, as the regular judge should have presided.

Reviewing these cases, I find those of Davis v. Fish and Grable v. State discredited, if not positively overruled, by later decisions in Iowa; that Cooper v. Am. Ins. Co., 3 Colo., 318, was decided upon the authority of Grable v. State and Archer v. Ross, and that this latter case was criticized in State v. Leahy, 1 Wis., 225, where it is said of the opinion: "The reasoning of the court does not seem clear;" that the California cases do not apply, neither does the Millington case in Kansas; that Ex parte Lilley, the South Carolina case stands alone without adverse criticism because apparently unnoticed by the courts in the discussion of the question, and might have been decided on other grounds. Against these are the cases of State v. Leahy, In re Hunter's Estate, Harris v. Gest, Mechanics' Bank v. Withers, Carland v. Commissioners. Most of the cases cited by counsel for plaintiff in error, then, have been overruled, discredited or do not apply. In some of them, statutory provisions make them clear. In this jurisdiction, there never was a statute fixing the date for closing a term of the district court, nor how long it should continue. The statute being silent, the inherent power of the court to adjourn to a distant day, without interference with its duties elsewhere is unfettered, as nothing seems clearer than that independent of statutory warrant or interference, courts of general jurisdiction have authority to hold adjourned terms, and certainly this may be done, when such terms do not conflict or interfere with the business of regular terms.

No such conflict or interference has been shown and none appears from the record in this case. It can not be presumed that there was any conflict between the Carbon and Sweetwater terms, as in the absence of such a positive showing,

every presumption is in favor of the legality and regularity of the proceedings of a court of general and superior jurisdiction. The record is absolutely silent as to whether or not the adjourned term of the Sweetwater district court was in session at any time during the Carbon County term of said court, and we have no right to assume that there was any conflict. "Adjournments to a distant day are, in general, highly impolitic, and ought not, except for very weighty and special reasons to take place." Harris v. Gest, supra. It appears from the record that these reasons were present at the adjournment of the Sweetwater term. The trial of the cause was finished but the judge had to review a voluminous record and to decide intricate points of law. He may not have had time to give that case careful examination in the one judicial day intervening between the opening of the court in Carbon County. Further than this he was soon to leave the bench, as the record shows that he was succeeded by another judge before the next term of the Sweetwater court. His anticipated retirement from the bench, the limited time at his command to consider an important case were evidently considered judicially and judiciously. Even if these cogent reasons could not be gathered from the record, the exigency of the adjournment was a matter wholly addressed to the sound discretion of the presiding judge. This was not abused; on the contrary it appears to have been well exercised in attempting to arrive at an intelligent decision in an important case as speedily as possible. The statute then provided that: "If any judge, duly assigned by law to any judicial district in this territory, shall be unable from any cause to attend any term of any court in his judicial district, or be prevented for any reason from holding such term, or any part thereof, or be so situated in respect to any cause pending in such court as in his opinion to make it improper for him to try, or in any manner dispose of it, the judge of any other judicial district in this territory may hold such court, either for the whole term or any part thereof." Sec. 846, Rev. Stat. Wyo. It seems that under this statute, a judge might call in another judge to hold the remainder of a term for the trial

of a cause that he could not begin and finish or which might consume such an amount of time as to prevent him from holding court at the appointed time elsewhere in his district. What would prevent him, under this statute, from asking another judge to hold the remainder of the term, or indeed the whole of it, while he was engaged elsewhere in his district in holding court. Sec. 844 of the revision contemplates such a state of affairs when it provides for the assignment of a judge of another district to act in the stead of a judge who "shall be unable from any cause to dispatch the business of his district." With these statutory provisions in force at the time of the judgment in the court below, I am unable to see that any reason, either fancied or real, could be given against the holding of two district courts in the same district by different judges at the same time.

The court below followed the universal practice of the district courts in adjourning a term over an intervening term, a practice that has never been questioned before. I see no reason for setting aside this judicial custom which has become an approved and settled practice in this jurisdiction. I cannot consent to annul so many judgments and to set aside so many proceedings, particularly when such a determination would be founded on exploded law or decisions based upon exploded law. Communis error facit jus. Lawyers and laymen have for more than twenty years acquiesced in the action of the courts in this respect.

Not regarding the drift and weight of intelligent reasoning of the courts toward the position I assume in this case, and the positive decisions of courts of the highest respectability in line with my views on this branch of the case, I can never consent to upset the settled practice of our district courts in this respect on questionable law and upon ill considered cases. The supreme court of Iowa has not hesitated to repudiate the doctrine announced in the earlier cases in that State, and no court has, in my opinion, after a careful survey of all the authorities, set aside as illegal and void a judicial practice so necessary to the dispatch of business in nisi prius courts crowded with business, and so essential to the thorough ex-

amination and careful consideration of intricate cases. It is unnecessary for me to touch upon the question as to whether or not, under our statute, the judgment was one that could be rendered in vacation, if it was not rendered in term time, as I am thoroughly convinced that the judgment below in the case at bar was rendered by a competent court on a judicial day of that court.

3.   The testimony in the case has been fully reviewed by Mr. Justice Conaway, who concurs in the result reached by the majority of this court and his language is adopted in this opinion, as the other members of the court have arrived at the same results after a careful examination of the evidence presented by the bill of exceptions, certified to by the official territorial stenographer and by the trial judge.   This review is as follows:

This action is replevin by Charles Wagner, plaintiff below, for a stock of goods alleged by said plaintiff in his petition to be worth $17,000.   Defendant below, James Stirling, as sheriff of Albany County, held the goods by virtue of several writs of attachment running against E. J. Wagner under which he had seized the goods as the property of said E. J.

There were seven of these writs amounting in the aggregate to $8,469.17.   The goods seized constitute the principal portion of the entire stock of goods in a store at Laramie City, Wyoming.   The goods were not all taken in attachment at the same time.   Four of the attachments, amounting to over half of the aggregate mentioned, were levied upon portions of the stock on September 20th, 1888, another on September 21st, and another on September 22d, and another and the last on December 15th of the same year.

Defendant in error, the plaintiff below, claims the goods by purchase from E. J. Wagner made on September 15th, 1888. He exhibits in evidence a bill of sale of the goods from E. J. Wagner to himself, of that date, the consideration of which is $18,000.00.   He paid for the goods by indorsing a credit for that amount on a note for $19,000.00, of date February 1st, 1888, executed by E. J. Wagner in favor of Charles Wagner, bearing interest at the rate of eight per cent. per annum,

payable on demand. There is also indorsed on this note a payment of $851.10, of date March 2d, 1888. This sale of the goods of September 15th, 1888, and the note of February 1st, 1888, are both assailed as fraudulent and void. There is an attempt to show that the note was executed without consideration, or without adequate consideration, and that the goods were taken in part payment of the note in fraud of the actual and bona fide creditors of E. J. Wagner. The district court found in favor of defendant in error, that the goods were his property, and that he was entitled to possession of them, and allowed him $900.00 damages for their wrongful detention. Defendant in error is the principal witness in his own behalf, and, in order to establish the bona fide character of the $19,000.00 note, and his own rights as a bona fide creditor of E. J. Wagner, he explains the business transactions which led to the giving of the note. He is the only witness introduced who has any considerable knowledge of these transactions, and it might naturally and reasonably be expected that he would give a plausible and consistent account of the course of business between himself and his brother, E. J. Wagner, establishing as satisfactorily as the testimony of a single witness largely interested can establish, the good faith of these business transactions, and his own right to recover in the present action. He gives the history of the Laramie store as follows: He purchased at assignee's sale in 1884 the stock of Henry Wagner, another brother, for $20,000.00. Henry Wagner conducted the business for him until the fall of 1886 when Henry was discontinued as agent, and E. J. Wagner admitted as partner to manage the business. From this time forward defendant in error put into the business various sums in cash, commencing with $12,000.00 on or about September 1, 1886, and amounting while E. J. Wagner was in charge as managing partner to $20,800.00. Defendant in error does not include in this the value of the stock on hand when E. J. Wagner was put in charge as partner in the place of Henry Wagner as agent, and, strangely enough, no account is made of this stock anywhere in the statement of these business transactions. Defendant testifies that he

never received a dollar in return from these large investments until after his sale of the Laramie store to E. J. Wagner on February 1, 1888, for $19,000.00. At the same time he was carrying another store at Ogden, Utah, with E. J. Wagner in charge, in which he had invested $15,800.00. He testifies that at the same time when he sold the Laramie store he also sold this Ogden store to E. J. Wagner for $15,000.00. All this is not really pertinent to the present inquiry. The point to be arrived at is the consideration of the $19,000 note. This consideration is the value of the Laramie store above its liabilities on February 1st, 1888. If the store was worth more than it cost him the gain was his; if less, the loss was his.

Defendant in error testifies that this store was worth at that time $21,000.00 above its liabilities; also that the stock amounted to $25,000.00. If by stock he means the entire assets this would indicate an indebtedness of about $4,000.00. Otherwise the indebtedness indicated would be $4,000.00 in excess of credits or "good book accounts." Take the former construction as more favorable to him. Leading up to this, the defendant in error testifies to taking an account of stock in the Laramie store in the fall of 1887 on bill paper riveted together. He has not this account of stock to exhibit in evidence, but states his recollection to be that it showed the assets to be about $25,000.00, consisting of about $2,100.00 in good book accounts, and about $22,500.00 in goods. But on reflection, and after talking during the recess of court with his salesman, McCord, and with O'Donnell, one of the opposing counsel, he says he was not at Laramie or in Wyoming at any time between the fall of 1886 and September, 1888. He then came from his home in St. Louis, Mo., to Laramie, Wyo., on account of the "trouble," referring to the financial embarrassment of his brother, E. J. Wagner, in this business. So all of his statements as to the value of assets of the store in the fall of 1887 and on February 1, 1888, can be no more than hearsay. E. J. Wagner, managing partner, and Warren McCord, salesman in the store, were in position to testify understandingly as to these values. E. J. Wagner is not produced as a witness. Warren McCord is put on the stand and inter-

rogated by defendant in error upon another point. The failure to question upon this most material point is a suspicious circumstance. Defendant in error testifies that Mc-Cord had been in the store continuously four or five years. Mc-Cord himself testifies when interrogated by plaintiff in error that he first went into the store September 11, 1887, and that no inventory was taken, but there were "in the neighborhood" of eleven thousand dollars worth of goods there at cost price. He also testifies that on February 1, 1888, the day of the sale to E. J. Wagner, that there were about nine thousand dollars worth of goods in the store at cost price. He does not state their cash value. The only direct legal evidence as to the cash value of the goods at this time is the testimony of Langham and Symons. Langham, a traveling salesman, had been in the clothing business about twenty-five years, was familiar with the lines of goods carried in the Laramie store, and made it part of his business to estimate values of stocks carried in stores by inspection, and said he could make a very fair estimate of the value of the stock in question on February 1, 1888. He says:

"I can say from what business I had with E. J. Wagner, I was pretty familiar with this stock of goods at Laramie, and I know there had been no stock in that store for a year or eighteen months. It was very much reduced and scratched up very badly. I should hesitate to say that stock was worth five or six thousand dollars at the outside." Symons has practiced estimating stocks of goods in stores for insurance purposes and agrees with these figures. By the testimony of defendant in error, some of the goods were still on hand which had been bought at the assignee's sale in 1884. By Langham's testimony no new stock had been put in for a year or eighteen months, and the stock was much reduced and badly scratched up. By McCord's testimony the goods amounted to about nine thousand dollars at cost price. Five or six thousand dollars would seem to be a liberal estimate for that amount of goods consisting in part of the remnant and refuse stock accumulating in the course of several years

retail business, and wholly of old goods from one year old upward, and badly scratched up.

As to the debts and credits of the Laramie store we have only the statements of defendant in error. His statements are to the effect that the good credits were about $2,100.00 and the debts about $4,000, on February 1, 1888, when E. J. Wagner purchased the store and succeeded to the credits and assumed the liabilities. Then the approximate net worth of the Laramie store at that time is shown by the following figures taking the construction of the evidence most favorable to the defendant in error:

Highest cash valuation of goods.................$6,000.00
Value of credits ..............................  2,100.00

Total assets ...............................$8,100.00
Liabilities ....:.............. ................ 4,000.00

Net value of concern........................$4,100.00

And this is established by the solemn admissions of defendant in error, and by other testimony that is not contradicted in any particular; and this or some approximate amount is the only possible consideration for the note of $19,-000.00. On this note there is a payment of $851.10. Deducting this and allowing interest from February 1 to September 15th, 1888, there remains of the consideration a little more than $3,400.00. This is the utmost that the Laramie store could have cost the defendant in error, when taken by him in part payment of the $19,000 note on September 15th, 1888. He testifies that the indorsement of the note of that date of a credit of $18,000.00 was made by himself and the stock of goods accepted by him at that price as the result of an inventory made when he was not present. This evidently refers to the inventory made on the transfer of the goods to Judge Brown as his agent and by him to Warren McCord before the arrival of defendant in error from St. Louis. Such inadequacy of consideration alone is very convincing, if not con-

clusive evidence of fraud where the interests of other creditors are affécted.

But there are other indicia of fraud very prominent in the testimony of defendant in error himself, some of which should be noticed. He testifies that he procured the sale of the Laramie store by his brother to himself in consequence of his understanding that his brother was in "trouble." Speaking of the business at Ogden, he says he learned about that time that his brother E. J. "was attached," and that led him to "advise with Judge Brown." He further testifies that he learned of E. J.'s trouble through a telegram from E. J. himself, and that the telegram was of this import: "Flat on my back, creditors annoying me, can you assist me?" The telegram is produced and it actually reads: "Come at once. Flat on my back and creditors are popping on to me." It is dated September 14, 1885. He did come at once, arriving at Laramie September 18th. But he advised with Judge Brown by telegraph, who, as a result of such advising, and being also sent for by E. J. Wagner, took possession of the Laramie store from E. J. Wagner for Charles Wagner on September 15th, and turned it over the same day to Warren McCord, E. J.'s salesman in the store, who from that time held it for Charles Wagner and not for E. J. Here clearly is a sale or transfer by a merchant in failing circumstances of his entire stock in trade in his store to his brother for a grossly inadequate consideration. Thus some of the most convincing and universally recognized badges of fraud are proven in this case, partly by the testimony of defendant in error himself, and entirely by evidence that stands uncontradicted by any legal evidence whatever. Other circumstances indicative of bad faith are not wanting. Defendant in error testifies circumstantially to an account of stock of the Laramie store taken in October, 1887, "on pieces of paper, on this bill paper riveted together." It turns out that there was no account of stock taken at or near that time, and it does not appear that he was ever present at the taking of an inventory of the store. According to his own testimony he was not in Wyoming from about September 1, 1886, to September 18, 1888.

Defendant in error attempts to relate from memory chiefly, aided only by some detached business instruments of writing accidentally preserved, the entire course of the business, and the amounts of money advanced by himself for the business at various times prior to February 1, 1888. This can only be admissible as bearing upon the value of the Laramie store at that time as tending to show the consideration of the $19,-000.00 note, and ultimately the consideration for the store when bought back by defendant in error, September 15, 1888. The best evidence of such facts is the books of Charles Wagner & Co., the firm name adopted when E. J. was taken in as managing partner. These books are not produced. Neither is their absence satisfactorily accounted for. E. J. Wagner, the managing partner, is, no doubt, the proper person to produce those books, and the most competent person to testify to their identity, and to explain the entire course of the business. He would necessarily know much more about it than defendant in error, who was not in the Laramie store or in the western country from the inception of his partnership with E. J. Wagner in the Laramie store in the fall of 1886 until after its close on September 15, 1888. No effort to procure the attendance of E. J. Wagner has been shown. Defendant in error seems to ignore the best and most satisfactory means of proving his case and relies upon his own recollection which appears to be very treacherous. We might well stop here, but among several other features of the testimony of defendant in error tending to show bad faith, there is one so remarkable that it should not, perhaps, be passed over. Defendant in error testifies positively, both on his examination in chief and on his cross-examination, that $19,000.00 was the actual consideration for the sale by him to E. J. Wagner of the Laramie store on February 1, 1888, although he put into it $20,800.00 in cash, and it was worth $21,000.00 net. When asked on cross-examination if he had ever stated that he made this sale for $24,000.00 and took in payment one note for $19,-000.00, payable on demand, and five other notes of $1,000.00, each payable one each year for five years, he says he never made such statement, and that such was not the fact. This

testimony was given in May, 1890. On September 25, 1888, he had made an affidavit in another suit that he sold this stock of goods to E. J. Wagner for the actual amount he had invested in it, and that the amount was $24,000.00, and that he took E. J. Wagner's notes for the amount, one note for $19,000.00 payable on demand, and five notes for $1,000, each payable in one, two, three, four and five years. When confronted with this affidavit, he explains that he had forgotten both the affidavit and the five $1,000 notes, and further that they were "bonus notes," and not to be paid unless E. J. Wagner should be successful in the business. Defendant in error seems to think that he can treat them and have the court treat them as valid notes or bonus notes as best suits his convenience or interest.

These five notes fully cover the entire net value of the Laramie store on February 1, 1888. Charles Wagner attempts to testify that the value of the store was much more, but he actually shows that he knew nothing about it. His testimony on this point would be no more than hearsay at best. These notes are such as might be given in a reasonable and legitimate course of business, with some expectation of paying them from the profits of the business. The $19,000.00 note, payable on demand, on the contrary, is such a note as would not be given by any prudent business man in a legitimate course of business if he could avoid it. Few men would be reckless enough to try to do business on capital so obtained. Such a note places the business of the maker, if he be a man of moderate means or in need of accommodation in the way of credit, entirely at the mercy of any one into whose hands it may fall. That the consideration for it was grossly inadequate is established by undisputed testimony. That it is entirely without consideration seems satisfactorily established. In either view it becomes an instrument of fraud when goods to an amount largely in excess of its consideration, if there was any, are taken in payment or part payment of it to the injury of the bona fide creditors of E. J. Wagner. It was a facile instrument for wrecking the Laramie store, and was used for that purpose when necessary to defeat the honest claims of such

creditors.  E. J. Wagner bought the old, deteriorated stock of goods and the accounts of the Laramie store, of the actual net value of four thousand or five thousand dollars on February 1, 1888.  He proceeded to establish a credit.  He told defendant in error that his credit was good, that he was buying goods on credit, and that he thought he could work into a nice business.  At the same time, defendant in error testifies that he was holding his notes for $41,500.00.  This included $2,-500.00 "bonus notes" on the Ogden store.  This fact if known would have destroyed his credit, especially as $34,-000.00 of the amount was payable on demand.  This last amount is largely in excess of any assets appearing in his possession or control at any time.  Between February 1st, 1888, and September 15th of that year, he actually bought on credit and placed in the Laramie store large quantities of new and valuable goods.  Then, his creditors crowding him, he warns his brother, the defendant in error, and, without waiting his arrival, conveys to him the entire stock as payment of $18,-000.00 on the fraudulent note of $19,000.00.  The judgment in favor of defendant in error is not sustained by the evidence. It has been claimed that there is some evidence to sustain it, and that, it being merely a question as to the weight of evidence tending to contrary conclusions, the judgment should not be disturbed by the appellate court.  But, as already intimated, there is no legal evidence whatever showing more than a grossly inadequate consideration for the $19,000.00 note.  Defendant in error makes the bald statement that the store for which it was given was of the net worth of $21,000.00. He also shows that he could have known positively nothing about it.  At best he was testifying from hearsay.  This is not a formal objection of the character that is waived if not insisted upon.  Hearsay testimony is not authenticated by the oath of any person.  It lacks that essential element of legal or satisfactory testimony.  On the contrary, the testimony of three disinterested witnesses, testifying from personal observation and knowledge, fix the value of the stock of goods at a fraction of the amount of the largest of the six notes given in payment for them.  As to this point of the grossly inadequate

consideration of this note, there is no conflict of legal evidence. It is established by abundant and convincing evidence. These features of the evidence must have escaped the attention of the learned judge of the trial court. Allowing all of the consideration proved to apply to the $19,000.00 note, the effect of the judgment is that for an old deteriorated stock of goods and some book accounts, amounting together in value to four thousand dollars or five thousand dollars above accompanying liabilities, sold to E. J. Wagner on February 1, 1888, defendant in error receives in return in September following the stock replenished by new goods to large amounts which E. J. Wagner has succeeded in gathering in by the use of his credit. And it is of no consequence that a fraudulent note for $19,000.00 intervenes between the two transfers.

But it is hard to resist the conviction that the five $1,000.00 notes is what was actually given for the Laramie store on February 1, 1888. They cover its full net value or more. They disappear between September, 1888, and May, 1890. They may have been paid. The statement of defendant in error that they were not to be paid except on the contingency that E. J. Wagner should succeed in the business is more than counterbalanced by his affidavit setting them up as valid claims after E. J. Wagner had failed. If this be the correct view, the $19,000.00 note is without consideration. If the other view be the correct one the consideration is grossly inadequate. In either case, the note is fraudulent and void as against the bona fide creditors of E. J. Wagner, and as against the plaintiff in error who represents their interests. Other considerations of much force and plausibility have been urged for the reversal of the judgment in this case. It is not necessary to consider them. The single consideration of the gross inadequacy, or entire absence of consideration paid for the goods in controversy by defendant in error seems conclusive.

The judgment of the district court for Sweetwater County is reversed and the cause remanded for a new trial.

MERRELL, J., concurs.

CONAWAY, J., concurring.

I have serious doubts as to the validity of the adjourned term of the district court at which the findings of law and fact by the court were announced and filed and other proceedings had including the rendering of the judgment. I also doubt the sufficiency of the authentication of the bill of exceptions. But, inasmuch as my views, if developed at length, would result in a concurrence in the reversal of the judgment, I waive the discussion of the matter as not necessary to the decision of this cause. I concur in the reversal of the judgment.

---

## ON APPLICATION FOR A REHEARING.

CONAWAY, JUSTICE.

Defendant in error asks for a rehearing on the ground that the court erred in its conclusion that the consideration of the $19,000.00 note in question in the cause could be no more than the Laramie store. The testimony of defendant in error himself is explicitly and positively to this effect. In answer to the question, "You may state for what the note was given?" he says: "It was given for a stock of merchandise that I owned in the city of Laramie." And again, speaking of the sale of this store to E. J. Wagner on February 1st, 1888, he says: "I said to him I will sell this stock of goods for $19,-000.00, and I sold it to him." This is from the record. In attempting to subvert this positive testimony of defendant in error by their construction of other portions of his testimony his counsel have undertaken a task too great for human ingenuity to accomplish.

In accepting this uncontradicted testimony of defendant in error as true, his counsel urge that the court erred, and acted upon "theories of construction peculiar to itself," and "reached its conclusion upon considerations dehors the record." Also that this action of the court was a surprise to them. It is very frank in counsel to admit their surprise that the testimony of their client should be accepted as absolutely true. But when on behalf of the same client they urge that this is error, the surprise of counsel and court becomes mu-

tual.  If the testimony of the client is untrue, there are some ugly doctrines of estoppel standing in his way when he seeks to allege his own untruthfulness.  It is not necessary to go outside of the record to find uncontradicted and satisfactory evidence that the consideration of the $19,000.00 note and of the re-purchase by defendant in error in September, 1888, of the stock of goods, with its large additions of new and valuable goods, was grossly inadequate or entirely wanting.  Indeed it is quite apparent that the untruthfulness of defendant in error consisted not in stating the consideration less than it actually was, but in stating that there was any consideration whatever.

Neither is it necessary to go outside of the record to find evidence forcing the fair and disinterested mind to the conclusion that defendant in error was a party to numerous frauds perpetrated by E. J. Wagner as the active agent.  During the summer of 1888, E. J. Wagner bought large bills of goods upon false and fraudulent representations of his solvency.  Defendant in error himself testifies that E. J. Wagner told him at that time that he had established a good credit and was buying goods upon credit.  Defendant in error does not state whether or not E. J. told him that he represented himself as solvent in order to obtain credit.  As a business man he would know that without telling.  At the same time he was holding E. J.'s notes for $41,500.00, $34,000.00 of which was payable on demand, with which to gobble up whatever goods E. J. could get by the use of his credit, in advance of the claims of those who furnished the goods.  The litigation in this cause arises from his attempt to use this fraudulent $19,000.00 note for such purpose.  The principal element in the frauds of E. J. Wagner was his suppression, in his statements of his financial condition, of the fact of the existence of these notes.  To accomplish his frauds, he needed the co-operation of defendant in error, and he had it.  When in the accomplishment of a fraud, different parties perform essential and important parts, how can either deny his responsibility?  The part of E. J. Wagner was to establish a credit and buy the goods on credit by false representations of his

solvency. He did so. By suppressing the notes held by the defendant in error, he could and did represent himself to be worth about $8,000 above his liabilities. The part of defendant in error was to secretly hold these notes, and, when E. J. Wagner's credit failed, to take the goods in advance of bona fide creditors. This was as necessary to the consummation of the fraud as it was for E. J. Wagner to obtain the goods. Defendant in error did not fail to perform his part. Much of the evidence of E. J. Wagner's frauds was rejected by the trial court as being evidence of transactions not brought to the knowledge of defendant in error. This evidence should have been considered. It was not necessary in order to render defendant in error responsible for his participation in these frauds that he should have knowledge of every step taken by his accomplice in consummating the frauds.

We preferred to deal tenderly with defendant in error and his cause, and to place the decision upon the ground of want of consideration for his purchase of the Laramie store in September, 1888. This is a good and sufficient reason for the decision, and one good reason is enough. We have now added another good reason, and the record is not yet exhausted. The further point is presented that no right of possession of the property in question was shown in plaintiff in error, by virtue of writs of attachment or otherwise. This contention is not sustained by the record.

We will say further that it would have been in better taste if, instead of asserting that the court acted upon theories of construction peculiar to itself, counsel had shown in what the peculiarity, that is the departure from the accepted theories of the law and the consequent error consisted. In regard to this as well as to the assertion that the court reached its conclusion upon considerations dehors the record, we will simply adopt the language of the supreme court of Washington in a similar case. Counsel had said in the case referred to: "The rule announced by this court in its opinion, if that opinion is permitted to stand, strikes at the heart of all authority, overrules all principles of construction, and establishes an arbitrary system that can neither be followed with

safety nor looked to with confidence." The court says: "Vehement· declarations like this prove nothing, and are so far out of place in a communication by an attorney addressed to a court, that it would be justified in striking the paper in which they were contained from the files without any consideration thereof upon the merits; and even a more severe penalty might well be imposed." State ex rel. v. Board of Tide Land Appraisers of Whatcom County et al., 5 Wash. St., 425.

*Rehearing denied.*

GROESBECK, C. J., and CLARK, J., concur.