## LARKIN v. SALTAIR BEACH CO.[*]

No. 1650. Decided December 26, 1905 (83 Pac. 686).

1. JUDGES — TERMINATION OF TERM — BILL OF EXCEPTIONS — POWER TO SIGN — STATUTES — VALIDITY. — Revised Statutes 1898, section 3290, providing that a judge may settle and sign a bill of exceptions after he ceases to be judge, is not in violation of Constitution, article 8, section 5, limiting the term of office of district judges to four years.

2. WITNESSES — CROSS-EXAMINATION — SCOPE.—Where, in an action against the operator of a bathing resort for the alleged wrongful death of a patron while bathing in the lake, a witness testified on direct examination that he was familiar with the lake, that he had been there hundreds of times in storms, had had some experience, and had not seen much danger, and did not know that his experience on the lake was very perilous, plaintiff was entitled to cross-examine him fully with reference to his prior statements and acts, tending to show that the lake to his knowledge was dangerous.

3. SAME—IMPEACHMENT — CONTRADICTORY STATEMENTS.—Where, in an action for the death of a bather while bathing at defendant's resort, a witness for defendant, on cross-examination, denied having made statements contradictory to his testimony in chief, in which he denied that the lake was perilous, plaintiff was entitled to introduce evidence that the witness on former occasions had made statements contradictory to and inconsistent with his testimony with reference to the danger attending bathers at the resort; a proper foundation having been first laid on cross-examination for the introduction of such impeaching evidence.

4. NEGLIGENCE — DANGEROUS PLACES — BATHING RESORTS — CARE REQUIRED.—Where defendant maintained a public bathing resort on a lake, to which persons were invited to bathe for an admission fee charged, defendant was bound, in the exercise of ordinary care, to keep some one on duty to supervise bathers and to immediately rescue any apparently in danger, and to make prompt and reasonable efforts to recover any of such patrons on being informed that they were missing or in danger.

---

[*] Care required of proprietor of bathing resort, see note, 3 L. R. A. N. S. 982.

5. SAME.—Where defendant maintained a bathing resort to which the public was invited for an admission fee, but took no steps to mark safety limits or to provide for the rescue of bathers, and, on being notified that intestate was in danger of drowning and was missing, sent no one in search or to his relief until several hours had elapsed, defendant was guilty of such negligence as warranted a recovery for decedent's death.

6. SAME—CONTRIBUTORY NEGLIGENCE.—Intestate and two companions started to bathe at defendant's resort, and while within the territory where people generally were invited to bathe, and without knowledge or notice of danger, floated into an unmarked dangerous place, from which deceased was unable to escape, both because of his inability to swim, the subsequent exhaustion of his companion, and the action of the wind, which suddenly arose and drove both deceased and his companion out into the lake and finally against an island, where deceased was drowned. *Held*, that deceased was not guilty of contributory negligence as a matter of law.

BARTCH, C. J., dissenting in part.

APPEAL from District Court, Salt Lake County; S. W. Stewart, Judge.

Action by Anna M. Larkin against the Saltair Beach Company. From a judgment for plaintiff, defendant appeals.

AFFIRMED.

*Richards, Richards & Ferry* for appellant.

*C. S. Price* and *W. M. McCrea* (*W. H. King* of counsel) for respondent.

### APPELLANT'S POINTS.

The act of Wells, who stood *in loco parentis* was the sole and proximate cause of the injury. A parent is responsible for the contributory faults of his agent, and, in an action for injuries causing the death of a child, the contributory negligence of the deceased, or that of the parent's agent, to whom he had intrusted the child, is a bar to the action. (1 Shearman & Redfield on Negligence, secs. 65, 70, 71; Beach, Contributory Negligence [3 Ed.], sec. 131 and cases cited. *Bellfontaine R. Co. v. Snyder,* 18 Ohio St. 399, 24 Ohio St. 670.)

"A parent may recover for benefits reasonably to be expected from the child after majority, but a loss of service, as such, with a compensation based upon the probable earnings has no place in the making up of damages." (*Beaman v. Martha Washington Co.*, 23 Utah 139.)

The giving of contradictory and inconsistent instructions is error. (*Konold v. R. G. W. Ry. Co.*, 21 Utah 399.)

"A bill of exceptions or statement may be settled and certified by the judge before whom the case was tried after his term of office has expired." (*Finn v. Spagnoli*, 67 Cal. 331; *Leach v. Aitken*, 91 Cal. 485; *Depeaux's Estate*, 118 Cal. 523; *Sterling v. Wagner*, 31 Pac. 1032; *Railroad v. Ragdale*, 51 Miss. 447, 451; *Fellows v. Tait*, 14 Wis. 156; *People v. Judge of Superior Ct.*, 40 Mich. 630.)

## RESPONDENT'S POINTS.

One maintaining a bathing resort on the shore of a natural body of water, to which he invites the public, must use reasonable care to keep the bottom free from anything which may injure them. (*Boyse v. Union Pac. Ry. Co.*, 8 Utah 353; *Dinnihan v. Lake Ontario Beach Co.*, 8 N. Y. App. Div. 509.)

Persons conducting bathing resorts frequented by a great number of people should, in the exercise of ordinary care, keep some one on duty to supervise bathers and rescue any apparently in danger. (*Brotherton v. Manhattan Beach Imp. Co.*, 50 Neb. 214, 33 L. R. A. 598.)

If the owner or occupier of land, either directly or by implication, induces persons to come upon his premises, he thereby assumes an obligation that such premises are in a reasonably safe condition, so that persons there by his invitation shall not be injured by them, or in their use for the purpose for which the invitation was extended." (*Hart v. Washington Park Club*, 157 Ill. 9, 29 L. R. A. 492; *Richmond etc. Ry. Co. v. Moore* [Virginia 1897], 37 L. R. A. 258; *Thompson v. Street Ry. Co.*, 170 Mass. 577, 40 L. R. A. 345; *Sebeck v. Platdeutsche Volkfest Verein* [N. J.], 50 L. R. A. 199; *Conradt v. Clauve*, 93 Ind. 476, 47 Am. Rep. 388; *Peckett v. Bergen Beach Co.*, 60 N. Y. Supp. 966; *Cooley on Torts*, 605; *Breeze v. Powers*, 80 Mich. 172; *York v. Pacific & L. N. Ry.* [Idaho], 9 Pac. 1042; 1 Thompson on Negli-

gence [2 Ed.], 916; *Dunn v. Brown County Agr. Society*
[Ohio], 1 L. R. A. 754; *Francis v. Cockrell,* 5 Law Rep.
[Queen's Bench] 184.)

"A party has a right upon cross-examination to draw out
anything which would tend to contradict, weaken, modify, or
explain the evidence given by the witness on his direct exami-
nation, or *any inference* that may result from it tending in
any degree to support the opposite side of the case." (*Fis-
sure Min. Co. v. Old Susan Min. Co.,* 22 Utah 438, 63 Pac.
Rep. 588; *Walley v. Deseret Nat. Bank,* 14 Utah 305, 47
Pac. 147; 3 Encyclopedia of Evidence, 874, and cases cited.)

In every case the admission of rebuttal testimony is within
the discretion of the trial court. (*State v. Haworth,* 20
Utah 398, 69 Pac. Rep. 155; *Neilson v. Nebo Brown Stone
Co.,* —— Utah ——, 69 Pac. 289; *Harrington v. Chambers,*
3 Utah 94; *Godbe v. Young,* 1 Utah 55; *Smith v. Richard-
son,* 2 Utah 424; *State v. Webb,* 18 Utah 441, 56 Pac. 159.)

The following is the exception taken to the instruction by
appellant: "Defendant excepts to paragraph No. 11 and
every part thereof." This is too general and cannot be con-
sidered on appeal, except the charge is error as a whole.
(*Scott v. Utah Con. M. & M. Co.,* 18 Utah 486; *Brigham
City v. Crawford,* 20 Utah 130; *Beeman v. Martha Washing-
ton* [Utah], 63 Pac. 631; *Pool v. Southern Pac.,* 20 Utah
210; *Haun v. Rio Grande,* 22 Utah 346.)

"A person owing a duty towards another may be liable for
injuries resulting to the latter, although the former was in
the first instance no wise negligent, and although the latter,
by his own negligence, has placed him in a position of dan-
ger, provided that after discovering the latter's danger, the
former failed to take reasonable precautions, which, had they
been taken, would have averted the injury." (*Brotherton v.
Manhattan Beach Co.,* 50 Neb. 214; *Cincinnati, Hamilton
& Dayton R. Co. v. Kassen,* 16 L. R. A. 674; *Pickett v. Wil-
mington & W. R. Co.,* 30 L. R. A. 257; *Thompson v. Salt
Lake Rapid Transit Co.,* 16 Utah 281; *Philadelphia R. R. v.
Hogelans,* 66 Maryland 149.)

"The recovery of the parent is not necessarily limited to
the period of the child's minority, but the parent may recover
for the benefits reasonably to be expected to be received from
the child after majority." (*Baman v. Martha Washington
Min. Co.,* 63 Pac. 631.) The instruction complained of by

appellant has ample authority to sustain its correctness. (*Webb v. Rio Grande Ry.*, —— Utah ——, 24 Pac. 616; *Munroe v. Dredge Co.*, —— Cal. ——, 24 Pac. 304; *Beamon v. Martha Washington Min. Co.*, supra, and cases therein cited.

### STATEMENT OF FACTS.

This action was brought by plaintiff, Anna M. Larkin, to recover damages for the death of her son, Roy E. Larkin, alleged to have been drowned in the waters of Great Salt Lake at the bathing resort of the defendant. The negligence complained of is that the defendant failed to provide suitable guards or life lines, or to establish or erect notices indicating the depth of the water in and about said beach, or to provide suitable and proper persons to superintend bathing in said waters, or to provide persons or appliances to rescue bathers from drowning when in danger, or to provide a person or persons and to have such person or persons present on behalf of said defendant to search for and recover any of its bathers, bathing in said waters, when in danger, and that in consequence thereof the said Roy E. Larkin was drowned while bathing in said waters. The defendant answered, denying the allegations of the plaintiff's complaint charging negligence, and alleged contributory negligence on the part of Roy E. Larkin.

The facts in the case, as disclosed by the evidence, are about as follows: During the summer season of 1903 the defendant conducted a bathing resort known as "Saltair Beach," situated on the east bank of the Great Salt Lake, a distance of about fourteen miles from Salt Lake City. It is admitted the defendant generally invited the public to accept the facilities for bathing at said resort for hire. The resort consisted of a large pavilion and bathrooms erected on piling set out some distance in the lake. The bathrooms commenced at the pavilion, and extended about seven hundred feet in a northwesterly direction into the lake. There was no water under the pavilion itself, and none for some distance out to the west. At the point where the bathhouses ended the water was about six inches deep, and the bathers were usually conveyed from this point by means of a raft operated by the defendant to a pulley frame or "float stand" about one thousand

feet out in the lake from the bathhouses, and at a point where the water was about three and one-half feet in depth, and three hundred feet further out in the lake in a westerly and northwesterly direction the water was five and one-half feet deep. The plaintiff at the time of the suit had been a resident of Salt Lake City for seven years and was without means of support other than her own efforts and the assistance of her three children. The eldest, aged twenty years, was in poor health; Roy, the deceased was fourteen years old; and the youngest was eight years of age. Roy was kind and obedient to his mother, and was a boy of good habits. For three years he had been employed, and had given his earnings or wages of $5 per week to his mother. On July 23, 1903, plaintiff and deceased in company with several of their friends, went to Saltair Beach, leaving Salt Lake City about 2:20 o'clock in the afternoon, and arriving at the resort at about 2:55 p. m. Soon after they reached defendant's pavilion the deceased and two other members of the party, Ross Wells and Miss Pomeroy, purchased bathing tickets, each paying therefor the sum of twenty-five cents. They thereupon went to the bathrooms provided by defendant and proceeded to bathe in the waters of defendant's resort. They waded out through the shallow water from the end of the pier or bathrooms parallel with the cable to the float stand, and when the party had reached that point they lay down in the water and proceeded to float, forming what the witnesses call a "chain." Ross Wells, who was a good swimmer and who had frequently bathed at defendant's resort, was in the lead, and supported deceased by his feet, which were placed under the arms of the latter. Miss Pomeroy, who was also able to swim and was familiar with the resort, followed with the feet of deceased under her arms. Roy Larkin, the deceased, could not swim, and had never been in bathing at defendant's resort before. There were about fifty or sixty people bathing in the vicinity of the float stand when the party arrived there. When the deceased and his associates commenced bathing a slight breeze was blowing, and they gradually floated out into the lake into deeper water. There were no notices indicating the depth of the water or other danger signals in the lake. Ross Wells testified that when about 185 feet northwest from the float stand (and within the radius of where the patrons of defendant's resort usually bathed), the wind had increased in veloc-

ity and was blowing off shore; that he tried to put his feet on the bottom or bed of the lake, but because of the depth of the water was unable to do so; that he then suggested to his companions, the deceased and Miss Pomeroy, that they again form the chain and start back for the pavilion; that in attempting to reform the chain Miss Pomeroy was quite badly strangled, the water being heavily impregnated with salt, and soon after the deceased was struck in the face by a wave, and he also was partially strangled; that they finally reformed the chain, endeavored to return to the pavilion, but, in spite of their efforts, the high wind carried them out farther into the lake; that when he (Wells) found they were losing ground he made signals, and called to two men who were bathing in that vicinity for help; that the parties (presumably not understanding the meaning of the signals or his call for help) waved their hands to him in reply, and paid no further attention to his cry of distress; that it was finally agreed that Miss Pomeroy should try and make her own way back to the pavilion and notify the people of the danger that Wells and Larkin were in. The evidence also shows that Miss Pomeroy, after a severe struggle of about an hour and a half, arrived at the pavilion in an exhausted condition. Larkin being unable to swim or float without assistance, Wells with the double weight, was unable to make any headway toward the pavilion, and he and his companion were gradually carried out farther into the lake by the wind, which was rising and increasing in velocity, making the water very rough. Darkness came on, and the lights at the pavilion went out, and the boys were carried by the wind and waves over in the vicinity of a large island in the lake known as "Antelope Island," which is about six miles from the pavilion at defendant's resort. Wells let himself down many times in attempts to reach the bottom, but because of the depth of the water was unable to do so. He continued to float, and keep himself and Larkin on the surface of the water, until about 3 or 4 o'clock that night, when he became exhausted, his lower limbs were seized with cramps, and he was unable to longer continue the struggle. He gave some instructions to Roy Larkin, whom he had been supporting all this time, respecting the position in which he, Larkin, should keep his body in order to float and drift with the waves, with the hope that Larkin might be driven ashore alive. At this junction Wells gave up in despair, and Larkin

drifted away from him.   Immediately after they parted
Wells touched bottom, showing that they, without realizing
it, had drifted into shallow water.   When Wells discovered
that he could touch bottom he looked in the direction of Lar-
kin, who had, in the meantime turned over and was out of his
reach.   About this time Wells, so he testified, became uncon-
scious, and when he regained consciousness the sun was shin-
ing and he was lying on the shore of Antelope Island with his
feet and legs extending into the water of the lake.   He was
soon thereafter found by a searching party and taken to the
pavalion.   A few days thereafter Roy Larkin was found dead
on the shore of the same island, his body lying at the water's
edge.   Ross Wells testified that, while he did not anticipate
danger by floating out into the lake, yet, had he known the
depth of the water at the point where he discovered it was
over his head, 185 feet away from the raft, he would not have
gone there that day.   There is but little, if any, conflict in the
testimony respecting the foregoing facts.

The evidence introduced by the plaintiff tends to show that
when Miss Pomeroy returned to the pavilion she at once in-
formed plaintiff and the mother of Ross Wells of the danger
the boys were in; that plaintiff, immediately upon receiving
the information, dispatched a man with a boat to look for the
boys; that the party thus sent went out to a gasoline launch,
which was anchored about three or four hundred feet out in
the lake beyond the float stand, got upon it, and, not seeing
the boys, returned to the pavilion; that in the meantime
plaintiff and the mother of Ross Wells hunted up the man-
ager of the resort and informed him of the situation the boys
were in, as reported by Miss Pomeroy, and requested him to
send a man with a boat to rescue them; that the manager
stated to them that there were no seaworthy boats at the re-
sort, and tried to persuade them that their boys were not in
danger; that thereupon plaintiff returned to the pier, and
when the party returned who had been sent to look for the
boys she again sent him out to resume the search; that no at-
tempt was made by the manager of defendant's resort to res-
cue Ross Wells and his companion, the deceased, until after
dark, although they were repeatedly requested so to do by the
plaintiff and the mother of Ross Wells.   One F. D. Halm was
called as a witness by plaintiff, and testified that he was at
Saltair Beach on the day in question and learned through a

relative of Mrs. Wells that the boys were lost, and that in pursuance of this information he went to the manager an hour or more before sundown and informed him of the danger they were in and asked the manager to give the matter some attention. The testimony of plaintiff's witnesses respecting the time the manager of the resort was informed of the danger the boys were in, and the alleged indifference and neglect on his part in sending out a searching party, was denied by the manager, who was called and testified on the part of defendant.

The issues of fact were submitted to a jury, who returned a verdict for plaintiff, and assessed her damages at $6,500. To reverse the judgment entered on the verdict the defendant prosecutes this appeal.

McCARTY, J., after stating the facts, delivered the opinion of the court.

Respondent has filed in this court a motion to strike from the files in the case the bill of exceptions. It is claimed that no proper bill of exceptions was ever settled, for the reason that the bill of exceptions was signed and settled on the 2d day of March, 1905, by Hon. Samuel W. Stewart, judge of the district court, before whom said cause was tried, and that on said 2d day of March, 1905, he was no longer judge of said district court, his term of office having expired before that date, and that therefore he was without authority to settle and sign the bill. Section 3290, Revised Statutes Utah, 1898, among other things, provides that:

"A judge, referee, or judicial officer may settle and sign a bill of exceptions after as well as before he ceases to be such judge, referee or judicial officer."

But counsel for respondent contend that this provision of the statutes is in contravention of section 5, article 8, Constitution, Utah, which, so far as material here provides that: "The term of office of the district judges shall be for four years" and that the effect of the provision of the statute referred to is to extend the judicial functions of a judge of the district court beyond the period of his constitutional term of office. This question has been before the courts of other states, and, while some of the decisions hold that a judge has no power to settle and sign a bill of excep-

tions after the expiration of his term of office, we think the weight of authority and the better reasoning is in favor of the doctrine which holds that a judge who has tried a case may settle and sign a bill of exceptions after he ceases to hold the office. The reason for the rule is apparent. The bill recites the exceptions taken and is a narrative of what occurred at the trial, and the judge who tries a case and is familiar with all of the proceedings is better able to settle a bill of exceptions and thereby preserve to the parties to the action their substantial rights than would be his successor, who might have no personal knowledge of what occurred at the trial. The Constitution of Colorado and that of Wyoming have provisions similar to that of our own state limiting the term of office of district judges to a specified number of years, and the courts of those states have held that a district judge may settle a bill of exceptions after his term of office expires in cases tried before him while holding the office. *Stirling v. Wagner*, 4 Wyo. 5, 31 Pac. 1032, 32 Pac. 1128, is a well-considered case, in which the authorities are reviewed at length, and, in the course of the opinion, the court, speaking through Chief Justice Groesbeck, observes:

"The bill merely recites what occurred at the trial which is not of record, and is a mere narrative or historical account of those events. In some states, by consent of the parties, the clerk of the court may sign the bill, in others, where the judge is dead or disabled, two attorneys may allow and sign, while in others, in case of grave disputes, the bill may be settled by the testimony of bystanders or members of the bar. . . . When allowing a bill, the court does not pronounce a judgment; it merely states that the exceptions taken in the bill actually occurred during the progress of the trial."

The Supreme Court of Colorado, in the case of *Water Supply Co. v. Tenney* (Colo. Sup.), 40 Pac. 442, after referring to the conflict of authorities on this question and citing a number of decisions from the states which have adopted and adhere to the contrary rule, cite, with approval, the case of *Stirling v. Wagner,* supra, as well as decisions from other states which uphold and declare the same doctrine therein announced, say:

"We think those authorities which recognize the power of the judge to settle a bill after he ceases to hold the office are grounded upon the better reason, and that the rule is more consonant with the liberal

spirit of the code in observing the substantial rights of the parties to an action and disregarding technicalities. It saves expense to litigants, and avoids waste of time, yet preserves to the parties their substantial rights equally as well as does either of the methods."

The settling and signing a bill of exceptions being purely a matter of procedure, we have no hesitancy in holding that the Legislature may, by statute, regulate such procedure, and especially in view of the fact that there is no constitutional provision which either limits or prohibits such legislation.

Section 9, art. 8, Const. Utah, provides in part as follows:

"From all final judgments of the district courts there shall be a right of appeal to the Supreme Court. The appeal shall be upon the record made in the court below, and under such regulations as may be provided by law."

It will thus be seen that the Legislature is not only not prohibited from prescribing rules and regulations governing the appellate procedure in this state, but is expressly authorized to "provide by law" how appeals shall be taken. And the settlement of a bill of exceptions by a district judge in certain cases after the expiration of his term of office is one of the "regulations provided by law." The motion to strike the bill of exceptions from the files is therefore overruled.

David L. Davis, one of defendant's witnesses, on direct examination testified that he was, and had been for many years, familiar with the waters comprising defendant's resort; that "the first few hundred feet of the bottom of the lake is nearly dead flat, and then beyond that the pitch is a little more; a gradual pitch. There are no jump-offs; just about as gradual as you can make it. I never found any holes; never observed anything of that sort. It is impossible to have a hole remain long, for the sand would fill it up. That is my observation. . . . Have been in storms there hundreds of times. I have had some experience. I do not know that it has been very perilous. I have not seen much danger. It (the wind) does not produce any perceptible change upon the bottom of the lake." On cross-examination he testified in part as follows: "It is . . . possible that I said that Mrs. Larkin said, 'Is the lake dangerous?' and I said in reply to her, 'Yes, it is dangerous, and particularly in a storm.' Q. And then didn't you say that, 'It is a dangerous place there, because there are holes and bars, and the water gets

deep in places, and there are no nettings or guard lines, and
I have had time and again to bring in people with my gaso-
line launch, and the company hasn't as much as paid for a
gallon of gasoline for me ?' A. I don't remember saying a
thing like that. I did not mention this part that I had al-
ways picked up bathers there because it was dangerous. Q.
Did you not state at that time and place [referring to a con-
versation between witness and one M. P. Wells] that as a re-
sult, that is, of the sands shifting and bars being formed
from one to two feet and a half in twenty-four hours, mak-
ing holes, and by reason of the rough water and the waves,
bathers at Saltair got into danger, and that you and your son
had picked up between thirteen and fifteen persons ? (This
question was objected to as irrelevant, immaterial, and in-
competent. Objection overruled.) A. No. I didn't make
any statement just that way. Part of it would be like that.
I will explain that, owing to the shifting of the current in
and off-shore wind many bathers got into danger on account
of being drifted out, and that my son had picked up many that
were in apparent danger. The shifting sands would not be
included in my statement." Witnesses were called and tes-
tified in rebuttal, over the objections of defendant, to hav-
ing heard the witness Davis make the statements to which his
attention was called by the foregoing examination and which
were denied by him. The action of the court in overruling
the objections interposed to this testimony is now assigned as
error. Davis, having testified on his direct examination that
he was familiar with the lake, that he had been there hun-
dreds of times in storms, that he had had some experience,
that he had not seen much danger, and did not know that it
(his experience on the lake) was very perilous, plaintiff had
a right to cross-examine him fully on this branch of the case.
This testimony tended to show that the part of the lake com-
prising defendant's bathing resort was practically free from
danger to its patrons who bathed therein, and was evidently
introduced for that purpose, and also for the purpose of neu-
tralizing and overcoming the effect, if any, produced on the
minds of the jury by the evidence introduced by plaintiff
which tended to show that at times, and under conditions as
they existed at the lake when the unfortunate circumstance
under consideration occurred, bathing in the waters of the

resort is dangerous, and extremely so to those who happen to get into deep water. We are therefore clearly of the opinion that, in view of the testimony given by this witness in his direct examination, the cross-examination referred to was not carried beyond the scope which the authorities uniformly hold may be taken in the cross-examination of witnesses generally. Nor do we think the court erred in permitting plaintiff to introduce evidence tending to show that the witness Davis had on former occasions made statements contradictory to and inconsistent with his testimony given at the trial, which statements he denied making; his attention on cross-examination first having been specifically invited to the time, place, and circumstance of each conversation in which it is claimed they were made. This testimony was admissible for the purpose of impeaching Davis. Counsel for appellant contend, however, that the questions did not relate wholly to matters of fact, but in part call for the conclusions of Davis, and were therefore incompetent, and could not properly be used as a basis to impeach him. By an examination of these questions and answers it will be seen that the matters covered by the questions which counsel claim are objectionable (that bathers got into danger, etc.) were answered by Davis in the affirmative. It was only those alleged statements of his respecting material facts in the case that he denied. As to these statements plaintiff was entitled to introduce proof, and because the questions asked for the purpose of impeachment referred to some statement not denied by Davis is not a ground for reversal.

At the conclusion of the evidence the defendant requested the court to instruct the jury to return a verdict in its favor. The refusal of the court to give this instruction is assigned as error. It is urged on behalf of appellant that it does not appear from the record that the death of Roy E. Larkin was due to any negligent act or omission of defendant. The undisputed evidence in this case shows that the bathing season at this resort is limited to about three months in each year and that during the year (1903) when Larkin was drowned 50,000 of the patrons of this resort went in bathing, and it is admitted that there were no notices placed in the lake indicating the depth of the water, nor signs of any kind to advise the bathers of the limits of the resort within which they

could bathe with safety; neither did it keep at the resort a person with the necessary appliances to rescue bathers from drowning when in danger. In fact, the only supervision exercised by defendant over its patrons who bathed in its resort, as shown by the evidence of its general manager, J. E. Langford, was to invite and carry them out on the raft to "deep water." From that time on the bathers were left to shift for themselves, and, as stated, no means of rescue was provided by defendant, in case any of them, through lack of information, inadvertence, or otherwise, got into water beyond their depth, or a storm arose, or their situation was otherwise rendered perilous. And there is abundant evidence in the record which tends to show that an agent of the company had notice an hour or more before sunset of the peril that deceased and his companion, Ross Wells, were in, and that no effort was made by defendant to rescue the boys until about 9 o'clock that night. It is well settled that the owners of resorts to which people generally are expressly or by implication invited to come are legally bound to exercise ordinary care and prudence in the maintenance and management of such resorts to the end of making them reasonably safe for the visitors. And when the business is that of keeping or carrying on a bathing resort, the authorities hold that the proprietors or owners thereof are not only required to exercise that same degree of care and prudence with respect to keeping the premises in a reasonably safe condition, which the law imposes upon keepers of public resorts generally for the protection of their patrons, but the law imposes upon them the additional duty, when the character and conditions of the resort are such that because of deep water or the arising of sudden storms, or other causes, the bathers may get into danger, of having in attendance some suitable person with the necessary appliances to effect rescues, and save those who may meet with accident. Not only is it the duty of the owners of bathing resorts to be prepared to rescue those who may get into danger while in bathing, but it is their duty to act with promptness, and make every reasonable effort to search for, and, if possible, recover those who are known to be missing.

In the case of *Brotherton v. Manhattan Beach Imp. Co.*, 50 Neb. 214, 69 N. W. 757, the decedent, with a companion, was bathing in defendant's resort. The companion started to come in and discovered that Brotherton, decedent, was still

in the water; thereupon he went back and looked for him among the bathers, but did not find him. He then went and notified the employees of defendant company of Brotherton's absence. No effort was made to recover Brotherton, and he was drowned. In the course of the opinion the court said:

"We think it is a reasonable inference that persons of ordinary prudence, conducting a bathing resort frequented by 10,000 people a month, should, in the exercise of ordinary care, keep some one on duty to supervise bathers and rescue any apparently in danger; and, if not, that certainly it is a reasonable inference that persons so situated should, on ascertaining that a person last seen in the water is missing —without a moment of delay—exert every effort to search for that person in the water, and not merely advise a youthful companion of the missing person to search on the land, and coolly watch the result of such search. We think, in this aspect of the case, and in this only, the evidence presented an issue which should have been submitted to the jury, and for that reason the peremptory instruction was erroneous."

In *Dinnihan v. Lake Ontario Beach Co.*, 8 App. Div. 509, 40 N. Y. Supp. 764, the decedent held a ticket entitling her to bathe in the waters of the lake adjacent to the beach. She was drowned in a deep pool near to a toboggan slide, constructed by defendant in the water. The court in that case held, that

"The learned trial judge correctly instructed the jury that the defendant was bound to be active and exercise vigilance to keep the ground, whereon it invited its patrons to bathe, from becoming dangerous that this duty was an active one, and that the defendant could not escape liability by showing simply that it did nothing to produce the hole. These instructions laid down the rule of law applicable to the liabilities of keepers of bathing beaches." (21 A. & E. Enc. Law [2 Ed.], 471, 472; Thompson, Com. Law Neg., sections 994, 998; Cooley on Torts, section 606; *Boyce v. U. P. Ry. Co.*, 8 Utah 353, 31 Pac. 450, 18 L. R. A. 509; *Hart v. Washington Park Club*, 157 Ill. 9, 41 N. E. 620, 29 L. R. A. 492, 48 Am. St. Rep. 298; *Richmond, etc., Ry. Co. v. Moore*, 94 Va. 493, 27 S. E. 70, 37 L. R. A. 258; *Thompson v. Street Ry. Co.*, 170 Mass. 577, 49 N. E. 913, 40 L. R. A. 345, 64 Am. St. Rep. 323; *Sebeck v. Platdeutsche Volkfest Verien*, 64 N. J. Law, 624, 46 Atl. 631, 50 L. R. A. 199, 81 Am. St. Rep. 512; *Conradt v. Clauve*, 93 Ind. 476, 47 Am. Rep. 388; *Peckett v. Bergen Beach Co.* [Sup.], 60 N. Y. Supp. 966; *Breeze v. Powers*, 80 Mich. 172, 45 N. W. 130; *Dunn v. Brown County Agr. Soc.*, 46 Ohio St. 93, 18 N. E. 496, 1 L. R. A. 754, 15 Am. St. Rep. 556; *Francis v. Cockrell*, 5 Law Rep. Q. B. 184.)

Applying the foregoing principles of law to the facts in this case, we are not warranted in holding, as a matter of law, that the defendant was free from negligence. Neither are we prepared to say that the death of decedent was due to his own negligence. There is abundant evidence in the record to support a finding that when decedent and his companions first discovered they were in water beyond their depth, and the storm had overtaken them, they were about 185 feet from the float stand, and were entirely within the radius of territory in which the patrons of the resort usually bathed. Miss Pomeroy testified that, when she started to return to the pavilion to notify the people of the danger the boys were in, they were about 180 feet northwest of the float stand. F. A. Olson, a witness for the plaintiff, testified that he bathed in this resort quite frequently during the bathing season of 1903; that he walked and bathed around the float stand, and that about seventy-five yards to the north, and the same distance to the west and northwest of this stand, he could not touch bottom; that the water at these points was over a person's head. J. E. Langford, the then general manager of the resort, who was called as a witness by defendant, testified that to his personal knowledge, the people, invitees of defendant company, bathed from two hundred to three hundred feet to the north and northeast from that point. He further stated quoting his own language: "Some of them [referring to the bathers] bathed one thousand feet west; some of them north and northeast. The company knew they were bathing there, and knew the depth of the water. . . . Three hundred feet from the pulley frame west and northwest the depth of the water was five and one-half feet, possibly six." It is therefore conclusively shown that a point one hundred and eighty-five feet in any direction from the float stand would be entirely within the territory of the resort where the people, men, women, and children, usually bathed with the knowledge and consent of the defendant company. It cannot be held that decedent was guilty of contributory negligence, so long as he and his companions remained within the territory to which they, and the people generally, were invited to bathe, unless they, with knowledge or notice of the danger, put themselves in a position of peril, which was not shown or attempted to be shown at the trial. The undisputed evidence shows that when decedent and his companions discovered they

were in danger they made every effort in their power to return to the pavilion.

It is urged by appellant that the condition of the premises, such as the lay and character of the bed of the lake, the depth of the water, etc., as testified to by defendant's witnesses, demonstrated that the deceased and his companions must have been out into the lake far beyond the limits within which the patrons of the resort usually bathed. These, however, were questions of fact for the jury to determine, and the jury having found adversely to the defendant on these, as well as all other issues of fact in the case, the verdict cannot be disturbed, there being ample evidence in the record to support it. There are other errors assigned, but we think they are without merit, and therefore deem it unnecessary to discuss them.

We find no reversible error in the record. The judgment, is therefore affirmed, with costs.

STRAUP, J., concurs.

BARTCH, C. J.

I concur in denying the motion to strike the bill of exceptions from the files; but, upon the grounds that the charge of the court was erroneous, misleading to the jury, and prejudicial to the defendant, and that certain opinion evidence was improperly admitted over the objection of the defense. I dissent from the affirmance of the judgment.