Appeal from Third District

## AFTON LIVE STOCK CO. et al. v. PETERSON et al.

No. 3956.    Decided November 22, 1923.    (220 Pac. 710.)

1. EVIDENCE—EVIDENCE THAT INITIAL PAYMENT MADE WAS OTHER THAN STATED IN CONTRACT HELD NOT A VIOLATION OF THE PAROL EVIDENCE RULE. In an action to declare terminated a contract for the purchase of all the stock of a corporation, where the contract without stating the total consideration recited an initial payment of $25,000 and subsequent installments, *held*, that it was not a voilation of the parol evidence rule to admit evidence that the total consideration was greater than indicated by the contract, and that the initial payment was in fact $50,000.[1]

2. CORPORATIONS—CONTRACT FOR PURCHASE OF ALL STOCK OF SHEEP-GROWING CORPORATION HELD NOT TO ENTITLE PURCHASER TO COMPENSATION FOR SERVICES OR EXPENSES INCURRED DURING LIFE OF CONTRACT. A contract for the purchase of all the stock of a sheep-growing corporation *held*, in effect, to give the purchaser possession, full control and management during the life of the contract, to the end that he would reap all profits and bear all expenses; so that, in an action to declare the contract terminated and payments made forfeited, evidence in support of a counterclaim for services rendered in managing the enterprise and for moneys spent for care, feeding, and maintenance of the sheep was properly excluded.

3. CORPORATIONS—PURCHASER OF STOCK OF SHEEP-GROWING CORPORATION AFTER DEFAULT HELD NOT ENTITLED TO COMPENSATION FOR SHEEP ADDED TO HERDS UNDER HIS MANAGEMENT. In an action to declare terminated a contract for the purchase of all the stock of a sheep-growing corporation, where defendant purchaser had covenanted to maintain the herd he had received from plaintiff at not less than 6,000 head which he admittedly failed to do, *held*, that a counterclaim based on delivery to plaintiff of 3,700 head of sheep which defendant had added to the herd during his management was properly denied; the total still being less than the agreed 6,000.

4. CORPORATIONS—CONTRACT FOR PURCHASE OF CORPORATE STOCK AND RETENTION OF PAYMENTS MADE IN CASE OF DEFAULT HELD NOT UNFAIR OR UNCONSCIONABLE. A contract for the purchase of all the stock of a sheep-growing corporation, to be paid for in installments, which, in lieu of other security for unpaid purchase

---

[1] *Brixon* v. *Jorgensen*, 33 Utah, 97, 92 Pac. 1004.

money, provided that in case of default payments made should be retained as liquidated damages and as rental, *held* not unfair, unjust, or unconscionable.

5. EVIDENCE—JUDICIAL NOTICE TAKEN OF GENERAL TREND OF BUSINESS AFFAIRS, ETC. Courts take judicial notice of the general trend of business affairs and of the general fluctuations of prices, etc.

Appeal from District Court, Third District, Salt Lake County; *L. B. Wight,* Judge.

Action by the Afton Live Stock Company and others against Oscar Peterson and another. Judgment for plaintiffs, and named defendant appeals.

AFFIRMED.

*Gustin & Pence,* of Salt Lake City, for appellant.

*Marshall, Macmillan & Crow* and *John F. Bowman,* all of Salt Lake City, for respondents.

FRICK, J.

The plaintiffs commenced this action against one Oscar Peterson and the Deseret National Bank to declare a certain contract entered into between plaintiffs and Peterson terminated, the payments made by Peterson thereunder to be forfeited to the plaintiffs, and that all the documents, papers, etc., placed with the Deseret National Bank in escrow, together with all other property delivered to said Peterson under such contract, to be forthwith returned to the plaintiffs as provided in said contract. The case was tried to the court, which made findings of fact and conclusions of law in favor of plaintiffs, and entered judgment accordingly. Peterson, hereinafter called appellant, alone appeals.

The pleadings in the case cover 42 pages of the printed abstract, and it is therefore impractical to set them forth here. It should be stated, however, that appellant, in his

answer, in addition to certain admissions and denials, pleaded an affirmative defense, and, in connection therewith, also set up three counterclaims, all of which were either denied or avoided by the plaintiffs in their reply. The counterclaims will be more particularly referred to hereinafter. The findings of the court are likewise too voluminous to be set forth in full. We shall hereinafter refer to and set forth such portions of them as may be deemed necessary to a full understanding of the questions decided.

In view of the questions raised by the appellant it becomes necessary to set forth certain parts of the contract entered into between the parties in full, and to state the substance somewhat fully as to other parts.

In the contract it is stated that said corporation, the Afton Live Stock Company, is the owner of lands, sheep, and other property, and is engaged in conducting the business of raising, grazing, buying, selling, and dealing in sheep, and that J. S. Ostler, Hattie K. Ostler, S. L. Ostler, and P. K. Goddard are the only stockholders and officers of the Afton Live Stock Company, a corporation; that said "stockholders are desirous of selling all of the outstanding capital stock of said corporation upon the terms and conditions herein set forth, it being the purpose and intention of the parties hereto that such sale shall carry with it all of the property and assets of said corporation;" that, in consideration "of the promises and covenants hereto, hereinafter set forth, said stockholders hereby agree to sell to" appellant and the appellant "hereby agrees to purchase from said stockholders all of the outstanding capital stock of said corporation, consisting of (5,000) five thousand shares, payment for the same to be made as follows, to wit: Cash, upon the execution of this agreement, receipt whereof is hereby acknowledged by said first parties [plaintiffs], $25,000.00. * * *" The deferred payments are to be made as follows: November 1, 1919, $25,000 as principal and $4,834.90 as interest, leaving a balance of $113,140; July 1, 1920, the sum of $9,428.66, and interest, $4,525.60, leaving a balance of $103,711.34. Thereafter the sum of $9,428.66, with interest, is to be paid on November 1, 1920, on July 1,

1921, November 1, 1921, July 1, 1922, November 1, 1922, July 1, 1923, November 1, 1923, July 1, 1924, November 1, 1924, July 1, 1925, and the balance of $9,424.74, with interest, on November 1, 1925. We have omitted the amounts of the interest and the amounts due on each installment, all of which are set forth, however, in the contract at each installment period. The contract then proceeds:

"Reserving the right unto the said party of the second part (appellant) to cancel this agreement by full payment of the amount due * * * at any of the above installment dates."

It is then provided that the certificates of stock, together with a copy of the agreement, shall forthwith be "deposited in escrow" with the Deseret National Bank, together with other documents, all of which are specifically mentioned, and all of which shall remain in escrow "pending the full performance of this agreement or until such time as the same is terminated" as provided in the agreement; and, in case of full performance by the appellant, the certificates of stock placed in escrow shall, by the escrow holder, be delivered to appellant. The contract then provides:

"It is further understood and agreed that the said second party (appellant), in connection with the proper officer or officers of the said corporation, shall control and manage the affairs and business of said corporation during the life of this agreement it being understood, however, that said second party (appellant) is not to incur any expenses or indebtedness in that behalf except such as are reasonably necessary for the proper and businesslike conduct and management of said business, and is not to issue checks of the party of the first part (respondents) in amounts greater than ten thousand ($10,000) dollars, except the same be first countersigned by the president of said Afton Live Stock Company; and, whenever called upon to do so by the proper officer or officers of said corporation, said second party (appellant) shall exhibit a full and complete statement of the accounts relating to said business and showing in detail the final condition thereof; provided, however, that all monthly statements from bank, together with canceled checks showing what they are issued for, shall be delivered to the bookkeeper of the Afton Live Stock Company monthly by said party, and expenses of bookkeeper, not to exceed one hundred ($100) yearly, shall be paid by said second party (appellant), as are all other expenses from April 1, 1919.

"It is further understood and agreed that said corporation is

Appeal from Third District

now the owner of sixty-nine hundred and thirty-five (6,935) head of sheep, of which there are seven hundred and thirty-one (731) ewe lambs of last year's crop, three hundred (300) Cotswold bucks, and fifty-nine hundred and four (5,904) stock ewes ranging in ages from two to six years, the graded ages being as follows: 900 head of 2 year olds; 3,500 head of 3 year olds; the balance 4, 5, and 6 year olds. And it is agreed that at the beginning of each winter season for the period of two (2) years from and after the date hereof, said second party (appellant) shall have on hand, unincumbered, at least eight thousand (8,000) head of sheep of the same qualities and ages as those above specified, and at the beginning of each winter season thereafter shall have on hand at least six thousand (6,000) head of sheep of said qualities and ages."

It is further provided that all the sheep and their increase shall be "kept marked and branded," specifying the marks and brands. The contract then further provides:

"No sales of said sheep, or the increase thereof, or the wool therefrom shall be made without the written consent of said corporation; the proceeds of all sales shall be first applied to the payment of taxes and the expense of operation of said business, and the balance, or so much thereof as may be necessary, shall be applied to the installments of the purchase price as and when the same respectively fall due. Said second party (appellant) shall pay indebtedness incurred by him in connection with said business whether said indebtedness be incurred in the name of said second party (appellant) or in the name of said corporation. Said corporation is to pay all accrued indebtedness and all expenses in the operation of said business prior to the date hereof.

"It is further understood and agreed that, upon default being made in the meeting of any one or more of the payments hereinbefore provided for, or in the performance of any of the covenants herein stipulated to be performed by the second party (appellant), all the rights and privileges of second party herein and hereunder shall immediately cease, terminate, and be forfeited, and any and all moneys paid by said second party to said first party shall be retained by the said first party as liquidated damages and as rental for the use of property hereinbefore mentioned, and said Deseret National Bank shall deliver said certificates and contracts and agreements, also this agreement, to said first party. Provided, however, that the party of the second part shall not be considered in default until 30 days after any payment shall become due as hereinbefore provided."

It is then agreed that the plaintiff stockholders "will maintain the corporate existence of said corporation during the

life of this agreement," and, further, "that time is the essence of this agreement and of all the provisions, covenants, and agreements herein contained." In conclusion it is provided that by a time specified plaintiff "shall furnish a list itemizing camp equipment, horses, and lands, which list shall be deposited with this contract with said Deseret National Bank, and which list together with sheep above described constitute entire assets" of the plaintiffs.

It will be observed that the plaintiffs are all designated as "first party." While the corporation and the other plaintiffs might well have been segregated and described in a different manner, yet that is of no importance, since the intention of the parties to the agreement and the purpose they all had in mind upon a consideration of the whole instrument seems to us to be quite clear.

Before proceeding to a consideration of the assignments, it becomes necessary to refer to the findings of fact.

The court, after referring to the agreement, found:

"That prior to the making of said written agreement it had been agreed between the plaintiffs and the defendant Oscar Peterson that the defendant Oscar Peterson should purchase the capital stock of the Afton Live Stock Company and the said stockholders should sell the same under substantially the same conditions as are contained in said written agreement for the consideration of $188,-132.90. That, pursuant to such agreement, which was entirely oral, the defendant Oscar Peterson had caused to be transferred to said plaintiff stockholders $25,000 face value of Liberty Bonds as an initial payment of $25,000, and it was agreed between plaintiffs and the said Oscar Peterson that this initial payment should not be mentioned in the formal written agreement, but that the purchase price therein described should be $163,132.90, and the initial payment therein receipted for should be $25,000 instead of $50,000 and that thereupon the said agreement, marked 'Exhibit A,' was drafted, executed, and delivered."

The court further found that the papers and documents mentioned in the agreement were deposited as therein provided; that, in addition to the initial payment of $25,000 provided for in the agreement, the appellant had paid the following sums, to wit: On November 3, 1919, $29,834.90; on July 1, 1920, $13,954.20; on November 1, 1920, $10,602.88; on November 13, 1920, $900; on September 3, 1921, $3,000;

on October 17, 1921, $5,030.20; and on November 2, 1921, $2,247.18—and that no other sums had been paid by appellant or on his behalf; "that on November 2, 1921, and at the time of the filing of the complaint herein, there was unpaid, due, and owing from the said Oscar Peterson [appellant] to the plaintiff stockholders, under the said contract, the sum of $14,048.27, and that the said Oscar Peterson, at the time of the filing of the complaint, had been in default in the payment of said amount for a period greatly in excess of 30 days." The court further found:

"That the said Oscar Peterson took possession of the property of the Afton Live Stock Company and managed and controlled it exclusively from the time of the execution of the said written contract up to on or about April 21, 1922, at which time the greater part of the personal property of the Afton Live Stock Company was surrendered by the said Oscar Peterson to the receiver of a court of the state of Wyoming appointed in a suit in which the Rock Springs National Bank was plaintiff and the said Oscar Peterson and no other person was defendant, since which date the receiver has handled and disposed of said personal property. That Oscar Peterson, nevertheless, at all times up to the present time, has claimed the right to continue in the possession, charge, and custody of the property of the Afton Live Stock Company, and to manage and control the same, and has failed and refused to give to the officers of the plaintiff corporation any control or management whatever in the business and properties of said company, but has managed and controlled the same without consulting any of the said company's officers. That said Oscar Peterson has sold sheep and wool of the plaintiff company without any written consent from any of its officers, and has not rendered to the plaintiffs or any of them any account of such sales, and has not exhibited a statement of any sort of the account relating to the business of the company or showing in detail the final condition thereof. That none of the plaintiffs demanded any such accounting of the said Oscar Peterson except that on or about October, 1921. J. S. Ostler, representing the plaintiff corporation, requested monthly statements from the bank, together with canceled checks of the Afton Live Stock Company issued by Peterson showing what they were issued for, to be delivered to the Afton Live Stock Company's bookkeeper, but was informed by the said Oscar Peterson that all checks had been signed in his own name, and about October, 1921, the said J. S. Ostler, representing the plaintiff corporation, again requested from said Peterson monthly bank statements, together with canceled checks showing what they were issued for, to be delivered to the bookkeeper of the

Afton Live Stock Company, but that no such statements, monthly or otherwise, were ever delivered by the said Peterson to the bookkeeper of the Afton Live Stock Company or to any of the plaintiffs. That, notwithstanding his default as hereinabove stated, the said Oscar Peterson, as stated in his answer and in the answer of the Deseret National Bank, has refused to instruct or permit the said Deseret National Bank to redeliver to the plaintiffs the stock certificates and other papers so deposited in escrow, and refuses to surrender the control and possession of the said properties and business of the plaintiff company to it, but claims and asserts that he is entitled to retain possession of said properties, and claims that he has paid certain sums of his own in the operation and management of said business of the Afton Live Stock Company which should be credited by the plaintiffs as a part of the purchase price for said stock."

The court then found that appellant had sold certain sheep and wool of plaintiffs, the purchase price of which had been applied ''upon payments due under said'' agreement. The court then found against appellant's contentions respecting the alleged misconduct of J. S. Ostler, one of the plaintiffs. The court then specifically found against the appellant upon all of his counterclaims, all of which will hereinafter be more particularly referred to. The court further found.

"That when the receiver heretofore mentioned took possession of the personal property of the Ashton Live Stock Company there were less than 6,000 head of sheep belonging to the Afton Live Stock Company, and there are now less than 6,000 head of sheep," etc.

The court made conclusions of law whereby appellant was adjudged in default as stated in the findings of fact; that the Deseret National Bank should surrender all of the escrow papers to J. S. Ostler; that all the rights of appellant in the agreement ''should be canceled and annulled, and the plaintiffs should be relieved of any further obligations thereunder, and that all sums of money paid by the said Oscar Peterson upon the purchase price of the shares of stock of the Afton Live Stock Company named in said contract should be forfeited to the plaintiffs''; that appellant be required to deliver to plaintiffs ''all of the property of the said company of which he now has possession, control or custody.''

Judgment was entered in accordance with the findings of fact and conclusions of law.

While a large number of errors are assigned, appellant's counsel, in their brief, have argued and relied only upon the following, which we here state in the language of counsel:

"There are a number of assignments of error, but they all touch upon two general propositions, and may be grouped under two general heads; the first being the admission by the court over defendant's objection of evidence tending to vary the terms of the written agreement and the existence of a verbal contract not pleaded, and not one upon which the action was based; the second being the denial to the appellant of the right to introduce in evidence the facts necessary to establish the allegations contained in his different counterclaims. There are other assignments but they will be found to correlate themselves with the one or the other of the aforementioned features."

In considering the errors assigned it will simplify matters if it be kept in mind that the court's findings of fact are not assailed in any way.

Proceeding, therefore, to a consideration of appellant's first ground of complaint, which is that the court erred in admitting in evidence the matters which are covered by the finding of facts hereinbefore set forth, and refers to the actual consideration or purchase price agreed upon by the parties and to the amount actually paid as the initial payment, we are clearly of the opinion that the appellant's contention that the admission of the evidence is contrary to the parol evidence rule is not tenable. The evidence which was admitted in no way controverted, varied, added to, or affected anything contained in the written agreement. Counsel overlook the fact that the full purchase price is nowhere mentioned in the agreement, and all that is there said is that $25,000 was paid, the receipt of which is acknowledged. That statement is followed by the several amounts which remain unpaid, all of which are correctly stated, and were not in the slightest degree varied or affected by the evidence which counsel objected to, and which they now urge should have been excluded. Neither did the evidence enlarge, diminish, or in any way affect any of the conditions or obligations stated in the contract. The evidence objected to disclosed

that a larger initial payment than $25,000 was made, and in that way the purchase price was shown to be larger than would be the case if only $25,000 had been paid as an initial payment, and the amounts of the deferred payments mentioned in the contract were added together.

To do that, however, in no way contravened the parol evidence rule. It is always proper to show the real consideration and to show what payments have actually been received. The precise question here involved was before the Court of Appeals of Maryland in the case of *Dinsmore* v. *Maag-Wahmann Co.*, 122 Md. 177, 89 Atl. 399, Ann. Cas. 1916A, 1270. There, as here, the written agreement did not disclose the whole consideration or purchase price, but merely described the amounts due on the deferred payments. In the course of the trial it became important to show the actual consideration or purchase price and the actual amount paid at the time of the purchase. The trial court admitted the evidence, and found the fact shown by the evidence, and the appellant there contended that the admitted evidence contravened the parol evidence rule, and hence was incompetent. The Court of Appeals, however, held that such was not the case, and held:

"Testimony explaining how a written contract was formed or arrived at, is not prohibited by the rule that written instruments are not to be varied, added to or explained by parol testimony."

Moreover this court has held against appellant's contention in *Brixon* v. *Jorgensen*, 30 Utah, 97, 92 Pac. 1004, where some of the cases supporting the district court's ruling are collated. This assignment must therefore be overruled.

This brings us to appellant's second proposition, namely, that the district court erred in excluding the proposed evidence relating to his first and second counterclaims, in which is also incidentally included the forfeiture of the payments appellant had made under the contract. In this connection it is contended that, if appellant's counterclaims, or only a portion of the claims preferred in them, had been allowed, as they should have been, he could not have been adjudged in default, as was done by the court, and hence no forfeitures could have been legally enforced against him. It is of the utmost importance, therefore, that the propositions above re-

ferred to be correctly determined. The reader will now appreciate, we think, why it was deemed necessary to set forth so many of the provisions of the contract, and why the court's findings, which are not assailed, had to be referred to somewhat in detail. In appellant's first counterclaim he sought to recover $500 per month for a period of three years and one month, aggregating the sum of $18,500, for services rendered by him to "manage and control the said affairs and business of said plaintiffs." The appellant offered to prove the facts just stated, and the district court excluded the proferred evidence upon the ground that, under the stipulations contained in the contract entered into between appellant and plaintiffs, he took possession of and managed and controlled the sheep and property as the purchaser, and had therefore rendered the services as he was compelled to do under the terms of the agreement. In other words, under the express terms of the contract appellant was to carry on the business which the plaintiffs had agreed to sell and he had agreed to purchase and pay for and to keep up the sheep to the number specified, and to maintain them and the property at his own expense. In view of the terms of the contract, which we need not repeat here, we can see no escape from the conclusion that the appellant was given possession and full control and management of the sheep and property to the end that he, and not plaintiffs, should thereafter reap all the profits that might be derived therefrom, and that he must bear all the expenses of management and maintenance as well as sustain the losses, if any there might be. Appellant, like any other purchaser of a business or enterprise, could obtain remuneration for his time and services only out of the profits of the business or enterprise after all the expenses of maintenance had been met. And if there were no profits he could not be compensated. It certainly would not be just that the vendor should be required to pay for managing the business or enterprise in case of loss while the vendee would reap all the profits in case there were any, unless the vendor had expressly bound himself to pay for the management of the business in case there were no profits. In this case the vendors not only did

not do that, but they in express terms provided that the appellant should pay all the expenses of maintenance and upkeep of the sheep out of his own funds or out of the profits, if there were any.

From what has been said it follows that the district court committed no error in excluding the profferred **2** evidence relating to the first counterclaim.

As to the second counterclaim the appellant averred that, during the time he had possession, management, and control of the property and sheep mentioned in the contract, he had "paid out for and to the use and benefit of said plaintiffs in the care, feeding, and maintenance of sheep of said plaintiffs the sum of $45,000;" that the expenditure of said sum was necessary for the purposes aforesaid, and that there is due from plaintiffs said sum, which, with interest, aggregates $58,113.91, for which amount he demanded judgment. If our conclusion respecting the first counterclaim is sound, then it follows as a necessary corollary that appellant cannot recover on his second counterclaim. He was as much bound to supply the funds for the things enumerated and for which he sues in his second counterclaim as he was for those that were sued for in the first one. It necessarily follows, therefore, that the court's ruling in excluding the proffered evidence relating to the second counterclaim must also be sustained

As to the third counterclaim, it is averred that, after appellant had taken possession of the sheep and property mentioned in the contract, he, "at the instance and request of plaintiff Afton Live Stock Company, and for its use and benefit in keeping up the sheep herds of said plaintiff corporation, defendant, delivered to said plaintiff Afton Live Stock Company 3,700 head of prime ewes of the reasonable market value of $15 per head; that said plaintiff received and accepted said sheep, but has wholly failed and refused to pay therefor," etc.; that there is due appellant for said sheep the sum of $55,000, for which he demands judgment.

The district court, after hearing the evidence, found that appellant did deliver to said company 3,700 head of ewes; "that said ewes were delivered and furnished * * * while the said Peterson was in sole charge and control of the prop-

erty and affairs of the Afton Live Stock Company under said
Exhibit A [the contract], and were not furnished at the spe-
cial instance or at the request of the Afton Live Stock Com-
pany, and were for the benefit of the said Oscar Peterson,
and not the plaintiff company.'' The court further found that
when the receiver took possession there were less than 6,000
head of sheep. Indeed, from the testimony of Peterson, it
appears that the receiver took possession of ''5,790 altogeth-
er,'' of which number, according to his statement, about
''two-thirds belonged to the Afton Live Stock Company.''
According to appellant's statement, therefore, he had on hand
when the receiver went into possession of his property at the
instance of his creditors 5,790 head of sheep, of which num-
ber about 3,860 head were sheep he had received from plain-
tiffs under the contract. In view that he had covenanted to
maintain the herd of sheep he had received from plaintiffs at
6,000 head, he, according to his own statement, had failed
to do so to the extent of more than 2,000 head. In view of
the evidence, we cannot conceive how the district court could
have found otherwise that it did; and, under the terms
and conditions of the contract, we are unable to see    3
upon what ground the court could have arrived at a
different conclusion upon the third counterclaim.

Appellant's counsel, however, vigorously contend that the
terms of the contract are not only unfair and unjust, but
that they are unconscionable. They arrive at that conclusion
by first adding together the payments which, according to
the court's findings, appellant had made on the contract,
which, with interest, amounted to the sum of $115,569.36.
They then add together the several sums of money claimed
by appellant in his counterclaims, which aggregate the sum
of $132,113.90. Counsel then contend that, under the con-
tract, the plaintiffs have virtually received from appellant the
sum of $247,683.26, and in addition thereto have repossessed
themselves of the property.

It will be observed that under the court's findings $132,-
113.90, the aggregate amount claimed by appellant in his
three counterclaims, consisted of legitimate expenses which

were incident to the upkeep and maintenance of the property, all of which appellant had expressly assumed under the contract. In view that plaintiffs waived an accounting by appellant the evidence does not disclose how much of the latter sum appellant realized from the sales of sheep and wool. Then, again, there is nothing to show what appellant's losses were during the three-year period that he had possession and management of the property. It does appear, however, from some evidence in the record, that appellant must have sustained considerable losses during some of the winter seasons. If, therefore, the amount of appellant's counterclaims is deducted, as it should be, the transaction assumes quite a different aspect.

Quite apart from that, however, if the whole transaction between appellant and plaintiffs is viewed in its true light there is little, if any, merit left to his counsel's contention. Appellant purchased a herd of sheep and other property kept in connection therewith. He agreed to pay a stipulated price therefor, a part of which he paid at the time of the purchase and a part only of the deferred payments he afterwards paid. He took possession of the property as a purchaser, and, instead of securing the deferred payments by mortgaging the property purchased or otherwise, he agreed to maintain the sheep up to a certain number, and to properly feed and maintain them. Not to require a mortgage on the property sold was a distinct advantage to appellant, since it left him at liberty to sell and to dispose of it according to his necessities, provided only that he complied with the terms of the contract. In lieu of a mortgage or other security, however, appellant was required to give some assurance that his obligations would be met; that the property should be properly kept, and not be dissipated. This is precisely what was contemplated by the parties and provided for in the contract. Appellant, as purchaser, might however, fail to live up to the terms and conditions of his contract, and hence some provision had to be made to protect the plaintiffs, which was that, in case of appellant's default, the payments made by him should be forfeited as liquidated damages,

and the contract be terminated. That is what was done, and appellant's counsel contend that, because the contract provided that it might be done, therefore it is unfair, unjust, and unconscionable. In this contention we think counsel are in error.

Let us assume that appellant had mortgaged the property as security for the deferred payments, and had defaulted, as is often the case in such transactions. Let us further assume that he had paid more than one-half of the purchase price, and had expended large sums of money in the upkeep and maintenance of the property purchased, which, if added to the payments made, would aggregate more than the original purchase price, and that all that was done before he made default. Let it be further assumed that after he had made all these payments and expenditures his general creditors had applied for and obtained a receiver to take possession of the property purchased, as well as his other property, and that thereupon the mortgagees of the property took possession under the mortgage, foreclosed, and sold the property, and applied the proceeds to the payment of the original purchase price; that, in view of falling prices, it was found that the mortgaged property was insufficient to pay the debt, and a deficiency resulted for which a personal judgment was demanded and obtained. Would, under those circumstances, any one seriously contend that such a transaction was unconscionable? We think not.

Nevertheless, such transactions and results, all know, frequently occur. In this connection let it be remembered that courts take judicial notice of the general trend of business affairs and of the general fluctuations of prices, etc. We therefore know, as all others know, that, if appellant had entered into the contract in question just three years before he did, and during the World War period, instead of entering into it only a few months after the war had closed, his results would have been vastly different. Instead of purchasing sheep on a declining market he would have had the benefit of a rising one, and his speculative venture under the circumstances then prevailing would have been

a great success instead of a dismal failure. Under such circumstances he would have realized large profits, while under the circumstances which prevailed after he entered into the contract in question he sustained great losses, and, we think, unavoidably so. Such, however, are the vicissitudes which, under certain circumstances, are neither the unnatural nor unusual results of speculative business and enterprises, and cannot be avoided.

The foregoing observations are here made for the sole purpose of showing that the contract in question is not subject to counsel's criticisms, and that there is nothing contained therein which is contrary to good morals, or even improper. It therefore becomes entirely unnecessary to enter upon the question of forfeitures and the abhorrence of courts to enforce them which is so earnestly urged upon us by counsel.

While the writer, at the oral argument was much impressed with counsel's contention that, in view of the sacrifices and losses which appellant had suffered under the contract, the same was, to say the least, very harsh in some of its provisions, yet, after a careful perusal of the whole record, and upon mature reflection, he is now thoroughly convinced that there is nothing in the contract or transaction, or in the court's rulings, which, in reason, can be criticized, much less avoided, by any court of justice.

In view of what has been said, as already intimated, we can subserve no good purpose in attempting a review of the case cited by counsel upon the question of forfeitures and kindred subjects, and for that reason we shall refrain from so doing.

The judgment should be, and it accordingly is, affirmed. Costs to be taxed against appellant.

WEBER, C. J., and GIDEON, THURMAN, and CHERRY, JJ., concur.